No. 72,240

STATE OF KANSAS, *Appellee,* v. JEFFREY S. COLLIER, *Appellant.*
(913 P.2d 597)

Opinion filed March 8, 1996.

*Jessica R. Kunen*, chief appellate defender, argued the cause and was on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: Jeffrey Collier appeals his convictions of first-degree murder and aggravated robbery along with his hard 40 life imprisonment sentence.

We have jurisdiction pursuant to K.S.A. 22-3601(b)(1).

Before we consider the trial errors Collier alleges and the propriety of the sentence imposed, we will briefly summarize the trial testimony regarding the underlying crimes. More specific facts will be presented as to each of the alleged appellate errors as they are discussed.

In October 1993, Collier and his homosexual companion, Benny Watson, had gone to Oak Park in Wichita to "roll some fags." Collier located a potential victim but decided he was too large. They left the park, picked up their roommate, Sharon Biffle, and attended an auction before they returned to the park.

Upon their return, Collier saw the victim, Michael Hendrix, reading a book and approached him. Watson remembered Hendrix as having tipped him during Watson's former employment as a female impersonator.

Collier lured Hendrix into a nearby wooded area, where Collier masturbated for Hendrix and convinced him to go to his apartment.

After 30 minutes, Watson went to the apartment and knocked on the door. He was told by Hendrix they were drinking beer and Watson should leave. Watson returned to his car and started honking the horn. Collier came out and said he would get Watson some money because he was "pulling a trick" with Hendrix.

Watson and Biffle went to a nearby tavern where they were located by Collier. Collier had them return to Hendrix's apartment. There, he obtained a laundry basket of things he had taken from Hendrix's apartment, including a paint sprayer which he later sold for $20.

After they returned to their apartment, Collier became angry and made several trips back to Hendrix's apartment, bringing back numerous items each time. Collier told Watson and Biffle the things came from Hendrix's apartment, where Hendrix was knocked out and tied up. Watson testified at trial that later that night Collier told him he had killed Hendrix and he would kill Watson and Biffle as well if they said anything.

Watson eventually told a third party, who told an additional party who called the police. The police found Hendrix's nude body with his hands tied tightly and a scarf around his badly bruised neck. The coroner testified the cause of death was strangulation, with evidence of a blunt trauma to the head and other injuries.

Testimony at trial indicated that after Collier was arrested and while he was being processed into jail, he told a police officer that he had just gotten out of jail after serving a 3-year sentence and guessed he could do 15 years. He also told two other officers that

"I always wondered what it felt like to be a murderer, now I know." Collier had in his possession a key ring with the initials M.K.H., and one of the keys on the key ring fit the door to Hendrix's apartment.

Police found various items of clothing and housewares that belonged to the victim in Watson and Collier's apartment. The victim's fingerprints, as well as Collier's, were obtained from several items which belonged to the victim.

Michael Ware, a prisoner awaiting transfer to a federal facility, befriended Collier in jail but testified for the prosecution. Ware testified that Collier would try out different stories based upon the witnesses' statements to see if they could be reconciled without implicating him. Ware testified that Collier told him the true series of events, which were substantially similar to Watson's testimony except that Watson was implicated to a much larger degree. In exchange for Ware's testimony, the prosecution agreed to write a letter to the United States Attorney informing him of Ware's cooperation which was likely to obtain him a reduced sentence.

It was stipulated that Collier had told Ware that because Hendrix was struggling and making noise, Collier wrapped the scarf around Hendrix's neck to silence him but that he had no intention of causing his death.

Biffle corroborated Watson's testimony, although her version varied in minor details. Other witnesses reported seeing Collier and Hendrix together and seeing Watson's car outside Hendrix's apartment.

Collier was convicted on theories of both premeditated and felony murder and on an aggravated robbery charge. For the murder conviction, he was sentenced to the hard 40.

## Scope of Review

Because a hard 40 sentence was imposed, we review this matter pursuant to the specific directions of K.S.A. 1993 Supp. 21-4627, which states:

"(1) A judgment of conviction resulting in a mandatory term of imprisonment pursuant to K.S.A. 1993 Supp. 21-3401 and 21-3401a, and amendments thereto, shall be subject to automatic review by and appeal to the supreme court of Kansas

in the manner provided by the applicable statutes and rules of the supreme court governing appellate procedure. The review and appeal shall be expedited in every manner consistent with the proper presentation thereof and given priority pursuant to the statutes and rules of the supreme court governing appellate procedure.

"(2) The supreme court of Kansas shall consider the question of sentence as well as any errors asserted in the review and appeal and shall be authorized to notice unassigned errors appearing of record if the ends of justice would be served thereby.

"(3) With regard to the sentence, the court shall determine:

"(a) Whether the mandatory term of imprisonment was imposed under the influence of passion, prejudice or any other arbitrary factor; and

"(b) whether the evidence supports the findings that an aggravating circumstance or circumstances existed and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances.

"(4) the court shall be authorized to enter such orders as are necessary to effect a proper and complete disposition of the review and appeal."

Although Collier did not object in the trial court to the manner of imposition of the hard 40 sentence or in every instance make continuing objections to trial errors which he now raises, we will consider each issue raised because of the specific statutory direction that we "shall consider the question of sentence as well as any errors asserted in the review and appeal and shall be authorized to notice unassigned errors appearing of record if the ends of justice would be served thereby."

*Did the trial court abuse its discretion in allowing the State to present evidence that the victim did not engage in sadomasochistic sexual behavior?*

A friend of the victim, Scott Curry, was called to testify that articles found in Watson's house were taken from Hendrix's apartment but was also allowed to testify as to Hendrix's reputed sexual practices and preferences regarding sadomasochism.

Collier, relying on *State v. Bradley*, 223 Kan. 710, 712, 576 P.2d 647 (1978), contends this attempt to show that Hendrix did not engage in sadomasochism improperly introduced Hendrix's good character before it had been attacked by the defendant.

The State contends *Bradley* is not applicable because the evidence related to whether the victim engaged in sadomasochistic

sex, not whether he was a peaceable, quiet, and orderly citizen. More clearly, the State contends the issue of Hendrix's sexual preferences was opened when Collier's counsel had earlier questioned a State's witness as to whether Watson had said that Hendrix engaged in sadomasochistic sex.

There is no error for both reasons the State cites.

One of the persons involved in the reporting of the homicide, Chuck Breckenridge, testified prior to Curry and was asked by Collier's counsel if Watson had told him that the person who died was "into S&M." Breckenridge affirmed that Watson had said that. A follow-up question described "S&M" as sadomasochism, a sexual preference. Because the issue had been raised earlier, it was perfectly proper and reasonable for the prosecution to show that the victim did not have a reputation among the Wichita gay community for sadomasochistic sex.

Additionally, the *Bradley* decision is more limited in its holding than Collier suggests. The rule it establishes prohibits the State from showing the peaceful reputation of a deceased until the victim's character is attacked. By no means can it be expanded to hold that it would be improper for a prosecutor to show that the victim would not ask to be tied, bound, and gagged, as Hendrix was when the police came to his apartment.

The testimony was proper for both of the reasons we have stated above. Collier's contention to the contrary is without merit.

*Was it reversible error for the trial court to admit testimony over Collier's objections that witness Benny Watson had AIDS?*

Collier cites several instances in the record where the fact that Watson suffered from AIDS was mentioned and argues this provides a basis for reversing his convictions. The fact that Watson had AIDS was stated to the jury during voir dire and again on opening statement without objection. During Watson's direct examination, he was allowed to state that he had AIDS, that Collier knew it, and that in the sexual relationship between himself and Collier, condoms or other protection was not used. Collier objected to several questions which he felt attempted to bolster the truth-

fulness of Watson's answers because he was dying. Collier's objection was sustained before any improper answer could be finished.

At one point during cross-examination, Watson was effectively impeached because there were several things he could not remember. As an excuse for his poor recollection, he explained that he had AIDS and could not remember what had happened 5 months ago. Collier contends that allowing Watson to claim AIDS was responsible for his failing memory was reversible error.

It is illogical for Collier to argue that permitting Watson to testify that his memory was impaired because of AIDS somehow bolstered Watson's credibility contrary to K.S.A. 60-422. Collier attempts a comparison to *State v. Steger*, 216 Kan. 534, 537, 532 P.2d 1115 (1975), where this court found it was improper to admit evidence of the success of the State's witness in securing convictions to enhance his credibility. The comparison is strange because not only is *Steger* highly dissimilar but also Collier's own counsel, not the State, actually elicited Watson's statement in cross-examination.

Collier's argument that Watson's claim that he was telling the truth because he was dying of AIDS was improper ignores that this statement was unresponsive to the State's question and the court sustained Collier's objection. Consequently, Collier may not predicate error on this ground. See *State v. Herschberger*, 160 Kan. 514, 517, 163 P.2d 407 (1945) (on appeal, jury will be presumed to have disregarded evidence about which an objection was sustained); see also *State v. Pioletti*, 246 Kan. 49, 67, 785 P.2d 963 (1990) (no reversible error when objection to prosecutor's comment sustained).

Additionally, Collier makes a different objection on appeal than he did before the trial court, which is clearly improper. See *State v. Skelton*, 247 Kan. 34, 44, 795 P.2d 349 (1990).

Nevertheless, because of our extensive scope of review in hard 40 cases, we will consider the overall argument as to Watson's testimony, even though an initial and continuing objection should have been made to preserve this issue for appeal. See K.S.A. 60-404; *McKissick v. Frye*, 255 Kan. 566, 582, 876 P.2d 1371 (1994). The possible terminal nature of Watson's condition might have

worked in favor of his veracity but could also have suggested that because of squabbles with Collier, Watson was likely to testify untruthfully.

Collier argues that Watson's medical condition was irrelevant. The State contends that Watson's medical condition was relevant to his motivation for testifying against his lover and that motivation is clearly a relevant issue to be examined at trial. The State further contends that the evidence was admissible under K.S.A. 60-420, which permits, subject to certain limitations, evidence on any matter relevant to the issue of credibility. See *State v. Franklin*, 206 Kan. 527, 528, 479 P.2d 848 (1971). Relevancy is more a matter of logic and experience than of law. Evidence is relevant if it renders the desired inference more probable than it would be without the evidence or if it has any tendency in reason to prove any material fact. *State v. Sexton*, 256 Kan. 344, Syl. ¶ 1, 886 P.2d 811 (1994); see K.S.A. 60-401(b).

The fact that Watson had AIDS does not in and of itself in any manner affect his credibility because it is not probative as to his honesty or likelihood of testifying accurately. Nevertheless, even if the testimony was erroneously admitted it would clearly be harmless. See *State v. Thompson*, 221 Kan. 176, 183, 558 P.2d 93 (1976) (erroneous admission of evidence harmless error where it could not have affected the result of trial in light of other evidence properly admitted). It is not shown that this deprived Collier of a fair trial in any manner. See *State v. Taylor*, 198 Kan. 290, 298, 424 P.2d 612 (1967). Likewise, the statement that Collier had unprotected sex had little likelihood of having affected the outcome of the trial. We fail to see that the admission of evidence concerning Watson's medical condition was an abuse of discretion.

*Was Collier denied a fair trial because of improper remarks by the prosecutor during closing arguments?*

Collier admits that no objection was made at trial to the prosecutor's remarks which he now complains of on appeal; however, under the specific direction of K.S.A. 1993 Supp. 21-4627(2), we are obligated to "consider . . . any errors asserted in the review and appeal."

The analysis of the effect of a prosecutor's allegedly improper remarks is a two-step process. First the appellate court determines whether the remarks were outside of the considerable latitude the prosecutor is allowed in discussing the evidence. This analysis commences with the holding that "[i]n criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as it is consistent with the evidence adduced." *State v. Duke*, 256 Kan. 703, Syl. ¶ 5, 887 P.2d 110 (1994). We further held in *State v. Baker*, 219 Kan. 854, Syl. ¶ 9, 549 P.2d 911 (1976), that "[c]ounsel may appeal to the jury with all the power and persuasiveness his learning, skill and experience enable him to use."

The second portion of the analysis is that if the remarks are found to be improper, this court must consider whether in light of the record as a whole they are so prejudicial as to amount to reversible error. "Each case must be scrutinized on its particular facts to determine whether a trial error is harmless error or prejudicial error when viewed in the light of the trial record as a whole, not whether each isolated incident viewed by itself constitutes reversible error." *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994).

The review which we make is governed by the following standard: "Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial." *Whitaker*, 255 Kan. 118, Syl. ¶ 7. "In deciding whether improper remarks by the prosecution during closing argument constitute harmless error, the reviewing court must be able to find that the error had little, if any, likelihood of changing the result of the trial. Such a belief must be declared beyond a reasonable doubt." *State v. Gibbons*, 256 Kan. 951, Syl. ¶ 9, 889 P.2d 772 (1995).

Collier first complains about the following excerpt from the State's closing argument:

"Now, there has been a lot of discussion in this case about sex. Jeffrey told Benny that they were involved sexually, that the defendant—that the victim was into S&M. Jeff told Michael Ware that there was sex involved and there had been overtones of sex all through this case. You know, one of the tragedies about Mi-

chael Hendrix's death is that now, some five months after his murder, his sex life and reputation in—sex life and his sexual practices are still subject to scrutiny and discussion.

"This is not a case about sex. No matter how much or how the defendant wants you to believe it is, it simply is not. It is about the taking of property and a murder to cover it up. Sex is not the substance of this case, it is the cover-up. It is the diversion, it is the ruse, it is the glitz, it's something that was put out there to throw you."

Collier contends that the statement that the discussion of the victim's sexual activities was "tragic" inappropriately expressed the prosecutor's personal opinion and appealed to sympathy to such an extent that it denied Collier a fair trial. This argument has no merit. In its proper context, this statement is not improper. It was within the prosecutor's wide latitude to argue that the sexual aspects of this case were gratuitous to the underlying crime. This statement does not appear to be geared toward injecting issues broader than the accused's guilt or innocence under existing law, but toward weeding out facts developed in the trial which were extraneous to the issue of guilt.

Collier next complains about a statement apparently designed to preempt any jury decision based on the fact the State agreed to write a letter to the United States Attorney on behalf of witness Ware in exchange for his testimony. The prosecutor argued: "But the one thing I want to say, if you are unhappy with me because I agreed to send the letter to the U.S. Attorney's office, be mad at me, don't let a murderer go free because of it."

Collier argues this statement impermissibly attempts to appeal to the jurors' fear for the safety of their neighborhoods. We have stated that it is improper to argue that "if you want to live in a community where a person can kill another person . . . in the manner that this was conducted and excuse it because he had a few drinks, that's up to you," *State v. Jordan*, 250 Kan. 180, 194, 825 P.2d 157 (1992), and that a statement is improper which implies the defendant would commit more crime if acquitted, *State v. Perales*, 220 Kan. 777, 780, 556 P.2d 172 (1976). However, there is nothing about the prosecutor's statement here that predicts consequences of an acquittal or intensifies any kind of a "fear in the neighborhood" sentiment.

The statement merely focuses the jury's attention on the evidence material to Hendrix's homicide and not on the prosecutor's actions in obtaining the evidence.

Collier further complains of the following excerpt:

"If you want to—let's talk about reasonable doubt. If you want to let that man go, you can speculate all you want and you can speculate yourself into thinking there is reasonable doubt because of these inconsistencies. Because we don't have the best witnesses. If you want to, you can speculate into thinking there is a reasonable doubt. If you want to you can rationalize that somehow there is reasonable doubt. But ladies and gentlemen, there is no reasonable doubt as to one, Michael Hendrix' murder; two, he was murdered during the commission of a felony, aggravated robbery; and three, there was an aggravated robbery; and four, that man murdered him, with premeditation."

There is no merit to Collier's contention that this is improper as appealing to fears of Collier's release into society. This is nothing more than a statement designed to argue that a few inconsistencies should not create reasonable doubt, and the statement is not in the same class as those held to be improper in *Jordan* or *Perales*.

Next, Collier contends the prosecutor's statements in the following excerpt were not reasonable inferences from the evidence:

"Look. Jeffrey Collier was looking for a victim. He announced that to Benny Watson that Saturday morning when he was looking for houses to rob and fags to rob. He continued the statements of that sort throughout the day. Sort of like a prostitute that lures a married man into a dark room under the pretext of having sex when the intent all along is to rob him. Why? Is a married man going to go to the police and talk about what happened, to his wife, or to the police about what happened to him when he was out there with this hooker? No. Same thing going on here.

"Jeffrey Collier went to Oak Park to pick up a homosexual, under the pretext of having sex, when his intent all along was to rob and perhaps to kill. And what a cover. The victim in this case was a known homosexual and picked up in Oak Park, to boot. The defendant preyed on someone who he wanted not to go to the police. He wanted a weak victim, someone unlikely to report and that's why he was there at Oak Park."

Collier contends it was pure speculation that he selected Hendrix because Hendrix was a homosexual who would not report the robbery. There was no evidence that Hendrix was unlikely to report the robbery, although that inference might not be unreasonable. In any event, this did nothing more than explain a plausible motive

for the selection of a robbery victim and was not improper. See *State v. Buckland*, 245 Kan. 132, 142, 777 P.2d 745 (1989).

Finally, Collier argues the prosecutor improperly told the jury not to consider the jury instructions relating to his theory of defense. He suggests that the State erroneously stated as a matter of law that they were only to consider certain instructions. This argument also has no merit. It is clear the prosecutor was arguing the evidence introduced at trial did not support the defense theory when the prosecutor said:

"Look at the verdict form and I'll tell you what we are asking you to do. We are asking you to find him guilty of one, premeditated first degree murder. We are asking you to two, find him guilty in the alternative of felony murder, you can do it both. We are asking you to do it both and we're asking you to find him guilty of aggravated robbery.

"Here's the verdict form. One, we the jury unanimously find the defendant guilty of murder in the first degree. The presiding juror, the foreperson signs it there. You don't stop there because then you have to say if you find him guilty of felony murder, if you find him guilty of first degree murder. . . .

"Now, ladies and gentlemen, you then flip it over and go to the last verdict form that deals just with aggravated robbery and you sign it off that you have found him guilty of aggravated robbery and you stop there. You do not consider second degree murder, either one; you don't consider involuntary manslaughter; that isn't what happened to this man. That isn't what happened. It is first degree murder all the way. You see this is because the defendant is claiming it wasn't premeditated, so you get to see instructions on second degree murder, the intentional killing of somebody without premeditation. Because he claims—

. . . .

"— it is an accident. Gee, he just held that for what, four to six minutes for him just to pass out; it was accidental, I didn't mean to kill him? . . .

. . . .

"[I]t is a killing of somebody during the commission of an aggravated robbery. And . . . whether he accidentally killed him during the commission of an aggravated robbery is irrelevant. All that matters is one, who committed an aggravated robbery; and two, he killed him. And that's it."

These arguments do nothing more than point out to the jury the verdicts that the prosecutor felt must be reached. There is no merit to any argument that these final comments were improper.

*Did the trial court fail to properly consider or grant Collier's request for appointment of substitute counsel and his claim of vio-*

lation of his rights to effective assistance of counsel under the Sixth Amendment and Due Process Clause of the Fourteenth Amendment?

Collier's first argument is that the trial court failed to properly consider his request for appointment of substitute counsel. On the first day of trial, while hearing motions in limine, the court considered Collier's request and heard his arguments. Collier contended he was not happy with his counsel, who had not visited him when he felt he should have. The trial court denied the motion. In denying the motion, the court specifically told Collier he had a good attorney, that the court had examined the file, and that there was nothing to indicate everything reasonably necessary had not been done on Collier's behalf.

"As a general rule, whether the dissatisfaction of an indigent accused with court-appointed counsel warrants discharge of that counsel and appointment of new counsel is for the trial court, in its discretion, to decide." *State v. Ferguson*, 254 Kan. 62, Syl. ¶ 1, 864 P.2d 693 (1993).

We also specifically held in *Ferguson*:

" 'As long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel (*State v. Henderson*, 205 Kan. 231, 468 P.2d 136).' " 254 Kan. at 70 (quoting *State v. Banks*, 216 Kan. 390, 394, 532 P.2d 1058 [1975]).

Although Collier had filed several pro se motions involving continuances or requests that he be granted counsel, the only request for substitute counsel came on the opening day of trial, and there is no logical reason why the court should not have denied the motion as it did.

It was not until the first day of trial that the record shows any rationale at all for requesting substitute counsel. Collier alleges it was the trial court which put off consideration of his complaints until the last minute. Yet all of the pro se motions Collier filed were resolved more than a month prior to trial. Consequently, it appears from the record before us that Collier's request for substitute counsel, considered and denied immediately before voir

dire began, was not timely. Although Collier maintains he requested substitute counsel as early as December 1993, nothing in the record establishes this allegation.

As to the adequacy of the trial court's investigation, the record shows the trial court permitted Collier to fully express the basis of his dissatisfaction with his counsel, which Collier did. From Collier's explanation of his complaints, and the trial court's own observations of the work done by Collier's counsel, the court could have had a reasonable basis for believing the attorney-client relationship had not deteriorated to a point where appointed counsel could no longer give effective aid in the fair presentation of a defense. We conclude the trial court did not abuse its discretion in refusing to appoint substitute counsel.

After the court considered and rejected Collier's motion for a new trial at allocution, Collier revisited the issue of dismissing his counsel along with many other complaints about the proceedings. He argued to the trial court, "You denied my right to fire my attorney, which I believe I'm allowed to fire up to three attorneys, if I have that right. I'm supposed to, I believe."

The trial court responded:

"I'm not sure where you get the three attorneys, the right to fire three attorneys. I believe that you must show to the Court that an attorney is not representing you in any appropriate fashion. I thought you were lucky, in my opinion, to get Mr. Jones from the Public Defender's office. He has a great deal of experience. He is a good trial attorney. He really knows what he's doing in court. And I believe your attorney effectively gave you the defense you deserved during the course of this trial. And I do not believe that Mr. Jones was ineffective, nor do I believe that you had a right, without proper cause, to fire Mr. Jones and/or any other attorney, unless cause is shown to the Court."

Collier further complained that he thought there were about 17 people who should have been subpoenaed for trial. The trial court said, in effect, that Collier's counsel had done a good job and he had a right to appeal.

Collier argues that the trial court should have investigated his claim and he was entitled to a hearing on the issue and appointment of counsel.

From the record it appears that while Collier may have complained about his counsel, he made no formal motion for new trial because he was ineffectively represented, nor did the court address such a claim by the governing standards. He only mentioned his counsel's ineffectiveness in an outburst in response to the trial court's ruling that he was not entitled to a new trial. Because the trial court did not understand Collier to be requesting a new trial based on his counsel's ineffectiveness, it appears that this issue was not raised in the trial court.

The State cites *State v. Kingsley*, 252 Kan. 761, 766-67, 851 P.2d 370 (1993), as support for its contentions that there must be a realistic basis and a motion for release before either a hearing or appointment of counsel is required for an ineffective assistance of counsel claim and whether the motion appears to have sufficient merit to warrant a hearing is in the trial court's discretion.

What in fact has happened in this case is that Collier's complaint regarding his counsel was insufficient to apprise the court he was seeking a new trial based on his counsel's ineffectiveness. Therefore, the trial court had no cause to consider whether a hearing on the issue was warranted. Although we are required to consider all issues raised on appeal without regard to whether there was a contemporaneous objection, we are not a finder of fact. Therefore, we must wait for a trial court decision on the matter of counsel's effectiveness. Because no claim of ineffective assistance of counsel was properly presented to the trial court, we will not consider that claim here. *State v. Hall*, 246 Kan. 728, Syl. ¶ 9, 793 P.2d 737 (1990).

*Should Collier's hard 40 sentence be vacated because the record shows the State did not file its notice of intent to seek the hard 40 until the day after arraignment in violation of K.S.A. 1993 Supp. 21-4624(1)?*

Although Collier did not properly object to the filing of the notice to seek the hard 40 during the arraignment proceeding, we review and consider this matter as we are directed to pursuant to K.S.A. 1993 Supp. 21-4627(2).

The requirements for proceedings to determine if a person shall serve a mandatory 40-year term of imprisonment read as follows:

"If a defendant is charged with murder in the first degree, the county or district attorney shall file written notice if such attorney intends, upon conviction or adjudication of guilt of the defendant, to request a separate sentencing proceeding to determine whether the defendant should be required to serve a mandatory term of imprisonment of 40 years. Such notice shall be filed with the court and served on the defendant or the defendant's attorney at the time of arraignment. If such notice is not filed and served as required by this subsection, the county or district attorney may not request such a sentencing proceeding and the defendant, if convicted of murder in the first degree, shall be sentenced as otherwise provided by law, and no mandatory term of imprisonment shall be imposed hereunder." K.S.A. 1993 Supp. 21-4624(1).

The arraignment in this case took place on November 4, 1993, with the transcript recording the following exchange:

"MR. ROTH: Your Honor, we have a notice we intend to serve on the defendant at the time of arraignment.

. . . .

"THE COURT: Okay. Mr. Collier's been provided with the information. And you're serving a notice.

"MR. ROTH: Yes, Your Honor. At this time, we are serving on the defendant a notice of intent to request a mandatory 40 year imprisonment should he be convicted of premeditated murder.

"THE COURT: Okay."

. The notice of intent to request the mandatory 40-year imprisonment is shown as being filed on November 5 at 8:20 a.m., the day following Collier's arraignment.

Collier was convicted on March 21, 1994, and sentenced on May 6, 1994.

On June 15, 1994, the State filed a "[m]otion to file Supreme Court Rule 3.04 statement out of time." In that motion, the State alleged that in light of the Kansas Supreme Court's decision in *State v. Peckham*, 255 Kan. 310, 875 P.2d 257 (1994), the record of arraignment was deficient and required additions to reflect the action of the prosecutor and the court during and after arraignment. The factual statement recited that the State had presented the original copy of its notice of intent to seek the hard 40 to the court at arraignment with the intent to file it with the court and

that it was received as filed. The motion said the court then took the document to the assistant clerk of the district court for filing in the clerk's office. The assistant clerk then entered the relevant data into the computer system, although the clerk did not file stamp the document until the following morning at 8:20 before the office opened for business. The statement also alleged this was the usual procedure in the district.

The State's motion to file its Supreme Court Rule 3.04 (1995 Kan. Ct. R. Annot. 20) statement out of time was purportedly served by placing a copy in the designated public defender's box in the district attorney's office on June 13, 1994. A hearing was held on June 16, 1994, at which neither Collier nor his attorney appeared. The trial court, Judge William Rustin presiding, granted the motion. Judge Rustin had not conducted the arraignment of Collier, rather, Judge David Kennedy had presided at the arraignment. On August 25, 1994, a copy of the factual statement that had been attached to the motion, signed by Judge Kennedy and prosecuting attorney Douglas Roth, was filed.

The State contends that this instance differs from *Peckham* in that the supplemented record shows the trial court understood the notice provided to it was being filed with the court at that time. What we have here is an uncorroborated after-the-fact statement as to a notice which shows on its face that it was not filed as required by K.S.A. 60-205(e).

Collier attacks the State's attempt to comply with 21-4624, contending that by trying to add to the record through Supreme Court Rule 3.04, the State violated Collier's Sixth Amendment right to counsel and Fourteenth Amendment right to due process of law.

Collier makes numerous arguments but primarily contends the State failed to comply with Supreme Court Rule 3.04; therefore, we are not to consider the statement it prepared. See *Dillon's Food Stores, Inc. v. Brosseau,* 17 Kan. App. 2d 657, 659, 842 P.2d 319 (1992). Rule 3.04 (1995 Kan. Ct. R. Annot. 20) provides:

"In the event no official transcript of the evidence or proceedings at a hearing or trial can be made and no other official record is available, a party to an appeal may prepare a statement of the evidence or proceedings from the best available means, including his own recollection, for use instead of a transcript. Within ten

(10) days after the filing of the notice of appeal, the statement shall be served on the adverse parties who may serve objections or propose amendments thereto within ten (10) days. Thereupon, the statement with objections or proposed amendments shall be submitted to the judge of the district court for settlement and approval, and as settled and approved shall be included in the record on appeal by the clerk of the district court."

First, Collier contends Rule 3.04 does not permit the addition to an official transcript, but only applies where no transcript at all is available.

Second, Collier contends notice of the hearing on the State's motion was improperly served on Collier's counsel because it was deposited in the public defender's mailbox at the district attorney's office, which did not comply with K.S.A. 60-205(b) regarding proper service of process on a party represented by an attorney. In addition, Collier specifically contends that no notice was provided to the newly appointed appellate counsel.

Third, Collier argues the State failed to provide the 10-day response time required by Rule 3.04 because a hearing on the motion was held the day after it was filed.

Fourth, Collier contends that holding the hearing one day after the motion was filed violated District Court Rule 131, which requires notice of a hearing not less than 7 days prior to such hearing in matters that are not ex parte.

Fifth, Collier argues the record does not affirmatively show the trial court complied with District Court Rule 134, which requires that a written notice of a ruling be mailed to the parties or their attorneys.

Finally, Collier argues that the statement of Judge Kennedy was not approved by the court for addition to the record.

Collier argues that taken collectively these shortcomings violate his Sixth Amendment right to counsel because he was unrepresented at the hearing and his Fourteenth Amendment due process rights because he was not personally present.

The State attempts to justify its actions by saying that its June 15, 1994, motion only sought permission to subsequently file a Rule 3.04 addition out of time. This contention hardly justifies the State's clear violation of court rules in an attempt to extract itself

from the identical position it found itself in as the result of our decision in *Peckham*, 255 Kan. 310.

In response to the argument that Rule 3.04 applies only where there is no available transcript, the State argues that although there was an official transcript of the arraignment generally, there was no official transcript of the proceedings concerning the filing of the hard 40 notice or the procedures by which it was "clocked in" in accordance with established Sedgwick District Court procedure. It should be noted that "this is the way it is done" is no excuse or justification in cases where the statutory remedy which is attempted to be enforced is one which this court has said is mandatory. In *State v. Johnson*, 255 Kan. 140, 155, 871 P.2d 1246 (1994), we specifically held that the notice provisions of K.S.A. 1993 Supp. 21-4624 are mandatory, and the failure to comply with such provisions requires a sentence imposed thereunder to be vacated.

In effect, the State contends that a Rule 3.04 statement may augment an incomplete transcript so long as it does not contradict it. Such a construction is not consistent with the rule that an official record "imports verity and cannot be collaterally impeached." *In re Marriage of Case*, 18 Kan. App. 2d 457, Syl. ¶ 2, 856 P.2d 169 (1993).

As to the propriety of service upon the public defender in his box at the district attorney's office, the State argues that, although this did not comply with K.S.A. 60-205(b), this is in accordance with an agreement between the public defender's office and the district attorney's office and that mailing the notice as required by statute would be a "fiscal impossibility." The State's allegations as to matters outside the record cannot be considered on appeal. See *Smith v. Printup*, 254 Kan. 315, 353, 866 P.2d 985 (1993). Even if the facts are as the State alleges, they do not provide authority for failure to comply with the statutorily established means of serving attorneys.

The dissent appears to concur with our holding that the State's attempted Rule 3.04 statement was improper but nevertheless relies on it to establish that the notice of intent to seek the hard 40 was properly filed with the court. As we have previously stated, the

official transcript is silent as to how a copy of the notice came to be filed the morning after the arraignment.

The only document from which we could conclude that the notice was filed with the court at the time of arraignment is the signed but not sworn-to statements of the prosecutor and judge, the accuracy of which Collier was not permitted or allowed to question. We should not base our decision on matters which are outside of a properly preserved record.

This case is controlled by *Peckham*, 255 Kan. 310, in which the State failed to comply with K.S.A. 1993 Supp. 21-4624 in the same manner it failed here. The facts in *Peckham* and our case appear to be identical with the exception that here the original and not a copy of the hard 40 notice found its way into the court file and the State here attempted after the fact to bolster its argument that the notice was filed with the court at the time of the arraignment.

We need not repeat here everything that Justice Abbott said in *Peckham* except to point out that we are dealing with what in 1993 was this State's equivalent to the death penalty, that filing as K.S.A. 60-205(e) requires was not accomplished, and that the State's attempts to supplement the record were improperly accomplished.

We here hold, consistent with *Johnson*, 255 Kan. 140; *State v. Deavers*, 252 Kan. 149, Syl. ¶ 6, 843 P.2d 695 (1992), *cert. denied* 125 L. Ed. 2d 676 (1993), and *Peckham*, 255 Kan. 310, that failure of the State to comply with the requirements of K.S.A. 1993 Supp. 21-4624 requires the hard 40 sentence entered herein to be vacated.

The convictions are affirmed, the hard 40 sentence is vacated, and the case is remanded for resentencing.

LOCKETT, J., concurring and dissenting: I concur in all the findings of the majority, except I respectfully dissent from its determination that the State did not file its notice of intent to seek the hard 40 sentence with the judge as required by K.S.A. 1993 Supp. 21-4627(1) and under K.S.A. 60-205(e).

K.S.A. 1993 Supp. 21-4627(1) requires that the prosecution shall file with the court notice of its intent to seek a hard 40 sentence and serve notice on the defendant or the defendant's attorney at

the time of the arraignment. K.S.A. 60-205(e) provides that a judge may permit pleadings and other papers to be filed with him or her, "in which event the judge shall note thereon the filing date and forthwith transmit them to the office of the clerk." If the notice is not filed and served as required by the hard 40 statute, the State may not request that the defendant be sentenced under the statute.

There is no doubt that at the arraignment, the assistant district attorney informed the judge the State intended to serve notice of its intent to request a mandatory 40-year imprisonment should the defendant be convicted of premeditated murder. The court acknowledged that the defendant had been provided with a copy of the information and had been served with notice of the State's intent to request the mandatory 40-year imprisonment.

The original of the notice of intent to request the mandatory 40-year imprisonment was filed—*i.e.* clocked in—with the clerk of the district court's office the day following Collier's arraignment. Subsequently, a factual statement of what had occurred with the notice was filed. The factual statement recited that the State had presented the original copy of its notice of intent to seek the hard 40 to the judge at the arraignment with the intent to file it with the judge and that the notice was received as filed by the judge. The judge acknowledged he received and accepted the document as being filed. The judge then took the document to the assistant clerk of the district court for filing with the clerk's office. The document was filed with the clerk's office before business began the next day.

The majority concludes that the State failed to comply with the notice and filing requirements of K.S.A. 1993 Supp. 21-4624. The majority concludes this case is controlled by *State v. Peckham,* 255 Kan. 310, 875 P.2d 257 (1994). In *Peckham,* the defendant and his counsel were served with notice of intent to seek a hard 40 sentence. However, a copy of the notice was not filed stamped as being received by the clerk of the court until the following day. Like Collier, Peckham maintained that the delay in filing of the notice precluded the imposition of the hard 40 term of imprisonment. The State argued that it did timely comply with the filing requirements by filing the notice with the district judge at the time of Peckham's arraignment.

In *Peckham*, the district judge denied Peckham's motion to preclude the hard 40 sentence. On appeal, the *Peckham* court observed that during the arraignment, the State had served the defendant with written notice in open court and then placed a copy of the notice on the judge's bench. It pointed out that the district judge did not state or remember that he had accepted the notice as being filed with the court at the time. The *Peckham* court noted that K.S.A. 60-205(e) provides that a judge may permit pleadings and other papers to be filed with him or her, "in which event the judge shall note thereon the filing date and forthwith transmit them to the office of the clerk." Quoting *Tobin Constr. Co. v. Kemp*, 239 Kan 430, Syl. ¶ 1, 721 P.2d 278 (1986), the *Peckham* court stated if the papers are filed with the judge, "filing is complete when the judge personally accepts custody of the papers." 255 Kan. at 316. The *Peckham* court found that the judge had not accepted the papers as being filed with the court. 255 Kan. at 318.

There is no doubt that the papers in this case were given to the judge and that the judge accepted the notice as being filed with him. The judge later transmitted the papers to the clerk for filing. Our question is whether, after receiving the papers as filed with the court, the judge was required to note the time and date and sign the papers before transmitting them to the clerk of the court.

In *State v. Spaulding*, 239 Kan. 439, 720 P.2d 1047 (1986), the court was faced with a similar question. *Spaulding* dealt with the issuance of a search warrant under K.S.A. 22-2502. That statute, after providing for written application or for the recording of an oral application, provides that if the magistrate is satisfied that grounds for the application exist or that there is probable cause to believe that they exist, the magistrate may issue a search warrant for the seizure of property. In *Spaulding*, the judge issued the warrant without his signature. Spaulding asserted that the failure of the judge to sign the warrant was not a mere technical irregularity because the judge's signature was necessary for a permanent manifestation of the judge's intent to show a finding of probable cause and an intent to issue the warrant. The defendant concluded that without the judge's signature, the warrant was a nullity. The *Spaulding* court observed that K.S.A. 22-2502 did not specifically

provide that the judge must sign the warrant. Thus, a search warrant was not to be quashed because of technical irregularities, such as the absence of the judge's signature on the warrant, not affecting the substantial rights of the accused. 239 Kan. at 441-42; see K.S.A. 22-2511.

Did the judge's failure to sign and date the notice before filing it with the clerk of the court affect Collier's substantial rights?

K.S.A. 60-205(e) states that the filing of pleadings and other papers with the court shall be made by filing them with the clerk of the court; however, the judge may permit the papers to be filed with the judge, in which event the judge shall note thereon the filing date and forthwith transmit them to the office of the clerk. Service under this statute was discussed in *Tobin Constr. Co. v. Kemp*, 239 Kan. 430. Tobin, dissatisfied with an award entered by the court, attempted to serve on all parties a motion to alter or amend the judgment on the last day for filing the motion. The motion was not filed with the clerk of the district court during the hours that the courthouse was open; instead, that evening after the courthouse had closed a courier employed by Tobin attempted to file the motion at the judge's residence. The courier was informed by the judge's wife that the judge was not at home. The judge did not receive the papers until several days later, and after reviewing the motion and without noting the filing date on the motion, the judge sent the motion to the clerk's office for filing. The *Tobin* court reviewed the rules of statutory construction in prior decisions interpreting similar statutes. The *Tobin* court noted that the statute was clear in that the judge must accept the filing of the papers with him and note the time and date of his acceptance and then forthwith take the papers to the clerk. It noted that the plain language of the statute cannot be interpreted to include leaving the papers with the judge's wife, secretary, or bailiff, or leaving the papers in the judge's car, home, or office. The *Tobin* court concluded that K.S.A. 60-205(e) provides that a judge may accept the pleadings or other papers to be filed prior to their transmission to the clerk's office for entry on the docket sheet. It found that under the statute filing is complete when the judge personally accepts custody of the

papers, though under the facts filing with the judge was not complete because he had not personally accepted custody of the papers.

I conclude that the K.S.A. 60-205(e) requirement that the judge sign and date the papers is directory, not mandatory. In determining whether provisions of a statute are mandatory or directory, it is a general rule that the provision is mandatory where strict compliance with a provision is essential to the preservation of the rights of the parties affected and to the validity of the proceeding, but the provision is directory where it fixes a mode of proceeding and the time within which an official act is to be done and is intended to secure order, system, and dispatch of the public business. *Sunflower Racing, Inc. v. Board of Wyandotte County Comm'rs*, 256 Kan. 426, Syl. ¶ 5, 885 P.2d 1233 (1994). Both *Tobin* and *Peckham* determined that filing with the court is complete under when the judge personally accepts custody of the papers. Therefore, the statute's requirement that the judge sign and date the papers is directory, and a judge's failure to sign is a mere technical irregularity.

If the failure of the judge to sign and dated the notice is a technical irregularity, the final question is whether, under the facts, the judge's failure to sign and date the notice before filing it with the clerk of the court affected Collier's substantial right to notice at the time of the arraignment. The answer is no. Collier's substantial rights were protected when a copy of the notice was served on him and the original was accepted by the judge as filed during the arraignment. The judge's failure to sign and date the notice is no different than the district court clerk's failure to time and date stamp the notice before placing the notice in the case file.

I would affirm the imposition of the hard 40 sentence because the notice was timely filed with the court and served on the defendant.

McFARLAND, C.J., joins the foregoing concurring and dissenting opinion.