THE STATE OF KANSAS v. ANDERSON GRAY.

1. WITNESS—*Improper Answer—Motion to Strike Out.* Where the question asked a witness fairly calls for competent testimony, but the witness in fact gives incompetent testimony in answer to it, the only recourse of the defendant is by motion to strike out, and where no such motion is made, no available error is presented.

2. HUSBAND AND WIFE—*Privileged Communication.* A conversation participated in by a husband, his wife, and a third person is in no sense a privileged communication, and may be narrated in evidence by such third person.

3. ACCOMPLICE—*Conviction of Higher Degree.* One who counsels, advises and procures the commission of a murder may be convicted of a higher degree of offense than the evidence shows the person who actually perpetrated the crime to be guilty of. (*The State v. Patterson*, 52 Kas. 335.)

4. MURDER, *Conspiracy to Commit, not Abandoned.* Where
two persons enter into a conspiracy to commit a murder, and the
plan agreed on is that one of the conspirators shall lie in wait in
ambush for their victim, the mere declaration of the one so lying
in ambush that at one time he mentally gave up the idea of com-
mitting the crime, where the evidence shows no act indicating an
abandonment or change of purpose, and where it clearly appears
that the crime was actually perpetrated in pursuance of the orig-
inal conspiracy, is not sufficient to show an abandonment of the
criminal design, and does not warrant an acquittal of the de-
fendant.

*Appeal from Sumner District Court.*

ANDERSON GRAY, having been convicted of murder
in the first degree, appeals. All the material facts are
stated in the opinion herein, filed April 6, 1895.

*W. E. Stanley, W. W. Schwinn,* and *James Lawrence,*
for appellant.

*F. B. Dawes,* attorney general, *H. L. Woods,* county
attorney, and *C. E. Elliott,* for The State.

The opinion of the court was delivered by

ALLEN, J. : The appellant, Anderson Gray, and one
Thomas McDonald were jointly charged with having
murdered Thomas Patton, in Sumner county, on the
5th of May 1894. The defendant, Gray, was separately
tried and convicted of murder in the first degree.
From that conviction he has appealed to this court.

The evidence clearly shows that the gunshot which
killed Patton was actually discharged by McDonald,
and that Gray was not, in fact, present at the shoot-
ing. The theory of the prosecution was that Gray
counseled and incited McDonald to commit the murder. It appears that McDonald was working for
Gray as a hired hand on his farm ; that Patton was a
tenant of Gray's, living on a portion of his farm
about half a mile distant from Gray's house. Both

McDonald and his wife lived in the same house with Gray and his family. Gray told McDonald that Patton had made slighting remarks about McDonald's wife. On the morning of the tragedy McDonald asked Patton with reference to what he had said. An altercation ensued, during which Patton struck McDonald. As Patton went away he challenged McDonald to meet him in two hours and settle the matter. McDonald was then furnished by Gray with a Sharp's rifle, which he took, and in company with Gray went out and practiced shooting at a target. Gray then cleaned the gun, furnished McDonald with more cartridges, and they together went to a grove lying south from Gray's house and extending up to the road leading to the house where Patton lived. A place was selected where McDonald was to lie in ambush until Patton should come along. Gray was then called back to his house on account of a neighbor named Probst having come to see him. Shortly afterward Patton came along the road in company with one Craig, and leading a mule. As he passed near the thicket where McDonald was concealed, McDonald shot him, inflicting a wound of which he died that night. The questions of law, argued on behalf of the appellant, relate to the introduction of evidence and instructions to the jury.

The first error alleged is with reference to the admission of a dying declaration of the deceased, Patton. The shooting occurred between 9 and 10 o'clock in the morning. Patton died at nine o'clock that night. During the interval he was conscious, and believed he was about to die. Mrs. Harmon, a witness called by the prosecution, testified to having a conversation with the deceased at about half past two in the afternoon, in which he told her he had no hopes of recov-

ery, and that McDonald shot him from the brush. In answer to the question, "State what he said?" The witness answered, "He said that Gray had it done." On the application of defendant's counsel, this answer was stricken out as not responsive to the question. After further questions as to what Patton said concerning his hopes of recovery, the witness was asked:

"Ques. Did he state to you or did you have any conversation with him as to who was concerned in the matter, or had anything to do with it, during that evening? Ans. That day I did.

"Q. About what time? A. I think it was about half past two; something near that.

"Q. What did he say in that respect? [This question was objected to as incompetent, irrelevant, and immaterial, and because no proper foundation for it had been laid. The objection was overruled, and the witness answered.] A. He said Mr. Gray had it done. Said 'Gray done this.'

"Q. State just how he said that. A. Just as I spoke it. Said 'Gray had this done. This was Gray's work.'"

These declarations were admitted in evidence, not as a part of the *res gestæ*, but as dying declarations. The rule as to the admission of such declarations was well stated in the case of *The State v. Medlicott*, 9 Kas. 257, as follows:

"Statements not under oath can only be admitted in evidence as dying declarations when they are made *in extremis*, and where the death of the person who made the declaration is the subject of the charge, and where the circumstances of the death are the subject of the declaration, and the person making them is in the full belief that he is about to die; and this condition of the mind must be made clearly to appear."

It is conceded that Patton was *in extremis* when the declarations were made, and without hope of recovery.

It is contended, however, that only such statements of
the deceased as would have been competent evidence
if he were living and on the witness-stand can be given
in evidence as dying declarations; that the statement
that "Gray had it done" was not the narration of any
circumstance connected with the tragedy, but was a
mere expression of opinion as to Gray's connection with
the matter. The rule of law is substantially as claimed
by counsel for appellant. Statements of the deceased
as to matters other than the circumstances surrounding
the homicide or expressions of belief as to matters not
within the knowledge of the dying man are inadmis-
sible. (Whar. Crim. Ev., § 294; *The State v. Footyou*,
24 Ore. 61; *The State v. Chambers*, 87 Mo. 406; *Math-
erly v. Commonwealth*, 19 S. W. Rep. 977; 1 Greenl.
Ev., § 159.)

The rule as stated by Greenleaf is "the declarations
of the deceased are admissible only of those things to
which he would have been competent to testify, if
sworn in the cause." It does not necessarily follow,
however, that error is shown by the record of any
avail to the appellant before this court. The question
to which the objection was interposed is, "What did
he say in that respect?" To understand the import
of this question, we go back to the preceding one,
"Did he state to you or did you have any conversa-
tion with him as to who was concerned in the matter,
or had anything to do with it, during that evening?"
This was answered, "That day I did." The question,
then, which the witness was called on to answer was,
"What did he say in respect to who was concerned in
the matter, or had anything to do with it?" This ques-
tion admitted of an answer entirely competent and
proper. It did not call directly for any expression of
belief or opinion. Any statement showing the presence

of Gray, or showing any fact connected with the tragedy, which pointed to the guilt of Gray, such, for example, as the fact that the gun from which the fatal shot was fired belonged to Gray, would have been responsive to the question, and competent evidence; would have been a fact to which Patton might have testified, if living and on the witness-stand. Instead, however, of such an answer, the witness gave the statement quoted. No objection was made to the answer, nor any motion to strike it out, or withdraw it from the consideration of the jury. Where a proper question is asked, and an improper answer given, the only remedy of the aggrieved party is by motion to strike out. It is impossible for the court in advance to exclude an improper answer to a proper question. The propriety of the answer cannot, in the nature of things, be determined before it is given. (*Hynes v. Jungren*, 8 Kas. 391; *Stone v. Bird*, 16 id. 488; *City of Wyandotte v. Gibson*, 25 id. 236; *City of Atchison v. Rose*, 43 id. 605.)

1. Witness— improper answer— motion to strike out.

Under these authorities, no error is shown in the action of the court. It is true that the question is not so carefully framed as it might have been; but as it fairly called for competent testimony, we do not think that the mere fact that a witness could possibly give an improper answer which would yet be responsive to the question a sufficient ground of itself for a reversal. The other testimony in the case renders the objectionable statement quite unimportant. The witness, Craig, testified without objection that while walking along the road toward the scene of the tragedy Patton told him about the difficulty he had had that morning, in the course of which he said, "McDonald was brought there for a game, and now he got the game and had to play his hand." N. J. Probst, who was with Gray

at the time of the shooting and went with him to the place where Patton was lying wounded, testified that "The first thing that was said [after they got there], Mr. Patton said, 'The coward shot me from the brush,' and he said [he addressed Mr. Gray], 'Gray, what did you let him have that gun for?'"

"Ques. Did he say what gun? Ans. I do n't know whether he said. I rather think he said the 'big gun'"

It does not appear that Gray made any response. It would appear from this question, which Patton asked Gray, that he recognized the gun as one belonging to Gray. There is a great deal of other evidence in the record showing that Gray was instrumental in bringing on the quarrel between Patton and McDonald; that he then took especial pains to excite McDonald's fears, and make him believe that Patton was a desperado, who would surely take his life if he had an opportunity to do so; that he urged McDonald to prepare himself, and to get in a position where he could kill Patton without incurring any risk of being killed himself; that it was at his suggestion that McDonald practiced shooting at a target; that he cleaned the gun afterward, and furnished the cartridges; that McDonald's wife protested against her husband going out to do the deed; that Gray insisted to her that her husband would be killed if he did n't kill Patton; that he then went with McDonald, selected the spot where he should lie in wait for his victim; that after the tragedy he swore before the coroner's jury that McDonald was in the house sick at the time; that he believed the shooting was done by Dave Patton, a cousin, with whom the deceased had had difficulty; that he had found tracks in the grove which other witnesses who made search for them failed to find; that he afterward

changed his story, and said he believed Patton was shot accidentally by men who were passing along the road shooting at a rabbit or something. The conversations between McDonald and Gray were proven only by the testimony of McDonald and his wife, but Gray's contradictory statements are shown by numerous witnesses, who appear to be entirely disinterested. Irod Dodson, a neighbor, testified that on that morning, after the quarrel between Patton and McDonald, in a conversation with Gray, ''I asked him, 'Do you think he will do what he says?' and he said, 'Of course he will; he is that kind of a man. He has killed seven men, and he says if McDonald do n't fix himself, why he will kill him, or get him, or something like that,' and when we went on further out to the road, or just before we went into the road, he said, 'I am going back and take my gun and take him out there in the grove, and I will practice him up, and kill the son of a bitch. If we do n't, he will get some of us.'''

If the jury believed the testimony of McDonald and his wife, which they were of course at liberty to do if satisfied of its truthfulness, the evidence is overwhelming and absolutely convincing of the guilt of Gray. Even if they were to discard the evidence of both the McDonalds, and to leave entirely out of consideration this dying declaration of Patton, which is objected to, still a very strong case remains, hardly admitting of a reasonable doubt, that Gray was the moving cause of Patton's death. When Mrs. McDonald was on the witness-stand, she was asked :

''Ques. Now, I will ask you, Mrs. McDonald, if a short time after this shooting, I forget whether it was the morning or the evening after, but a short time afterward, if you heard Mrs. Gray in the presence of Mr. Gray and your husband say anything about who was to blame for this? Ans. Yes, sir.

" Q.  State what she said.  [This was objected to, but the objection was overruled, and the witness answered.]    A.  On Saturday evening, after this trouble had occurred, Mr. Gray was standing in the kitchen washing his hands, and my husband and I were fixing to go up stairs.   Mrs. Gray came, to the middle door that came out of the front door, and was very mad, and she says, ' Tom, am I to blame for all this trouble that occurred to-day?'  And my husband did n't say anything, for he did n't have time.   She says, ' Mr. Gray says I am, and if I am, when the time comes to tell anything, I will tell the truth and I will see where I send him.'  And Mr. Gray said, ' Shut up ; we have got you all right.  Your evidence do n't amount to anything.   Go on Tom, do n't pay any attention to her ; to what she says.' ".

It is contended that the law not only prohibits proof of confidential communications between husband and wife, by one of them, but also prohibits the proof of communications between them by others who were present and heard them.   This contention is unsound.   Communications between husband and wife are not confidential when made in the presence of third parties, and part of the statements in this case were made directly to a third party.   In *The State v. Buffington*, 20 Kas. 599, it was held, that—

" In a criminal prosecution, where a letter previously written and sent by the defendant to his wife is not in the custody or control of either the defendant or his wife, nor in the custody or control of any agent or representative of either, but is in the custody and control of a third person, who is the prosecuting witness in the case, such letter may be used as evidence in the case by the prosecution against the defendant."

It is not the communication between husband and wife that is privileged, but the husband and wife are incompetent witnesses to prove the communication.

2. Husband and wife— privileged communication.

The law merely seals their mouths as to communcations that have passed between them. Whatever is said in the presence and hearing of third persons has none of the characteristics or attributes of a confidential communication. There is no secrecy about it. It is then published to the witnesses, who are in no sense parties to the conjugal relation. It has even been held that a conversation between husband and wife might be testified to by a concealed listener who overheard it. (*Commonwealth v. Griffen*, 110 Mass. 181. See, also, *Tays v. Carr*, 37 Kas. 141.)

The only other claims of error in this case arise on the instructions. The defendant asked the court to instruct, in substance, that the defendant, Gray, could not be convicted unless they also found that the defendant, McDonald, was guilty of some degree of felonious homicide; and that they could not convict Gray as an accessory before the fact of any higher grade of offense than the evidence convinced them McDonald was guilty of. The court did instruct the jury, as follows:

"You are further instructed, that before you can find the defendant, Anderson Gray, guilty as charged in this action, you must find from the evidence beyond a reasonable doubt, that the defendant, Thomas McDonald, was guilty of and committed some degree of felonious homicide as explained to you in these instructions, in the shooting and killing of Thomas Patton."

The court refused to instruct that they could not convict Gray of any higher degree of homicide than the evidence showed McDonald to be guilty of. The question is not presented as to whether the court erred in giving the instruction quoted, but we have already held, in the case of *The State v. Patterson*, 52

Kas. 355, that an accessory before the fact, may be convicted, after the trial and conviction of the principal, of a higher degree of offense than the principal was convicted of. We are fully satisfied with the decision in that case. It is entirely possible that one may deliberately plan a murder and cause it to be actually committed by another, either in the heat of passion or through groundless fear. Many cases may be imagined, which we shall not attempt to state, where the elements of deliberation and premeditation, and even of malice, might be absent from the mind of the actual perpetrator of the deed, yet present in the most ample degree in that of the one who planned, counseled, abetted and procured the commission of a murder. Whether it was necessary that McDonald should be proven guilty of any crime, we need not now determine. The instruction given was altogether as favorable to the defendant as the law applicable to the case.

*3. Accomplice— conviction of higher degree.*

Complaint is also made of the twenty-fourth instruction, a part of which only is quoted in the brief. The whole instruction reads as follows :

"The court further instructs the jury, that if Thomas McDonald, after having made preparations to kill the deceased, Thomas Patton, and having placed himself in ambush for the purpose of so doing, abandoned the purpose of so killing the deceased from ambush, or killing him at all, then such abandonment would be a defense for the defendant, Anderson Gray, but before the defendant, Anderson Gray, would be entitled to such defense, it must be shown to the jury that Thomas McDonald had wholly abandoned such preparations to kill the deceased, Thomas Patton, and had absolutely given up all preparation in that regard ; and it is not sufficient to prove such abandonment, by the mere declaration of the said Thomas McDonald

10—55 KAS.

of such mental change, provided that you believe, beyond a reasonable doubt, that he continued in the execution of the design until he shot and killed the deceased, Thomas Patton.   Before you would be justified in believing that there had been an abandonmen of such plans and preparations, there should be shown. some substantive act that the abandonment was real, and something more than his mere declaration of such change of mind.''

Counsel selects out and disconnects a part of one sentence, and contends that the court has, in effect, said that the uncorroborated testimony of an accomplice is legally sufficient to convict, but insufficient to acquit.    But the court, in the above instruction, said '' It is not sufficient to prove such abandonment by the mere declaration of the said Thomas McDonald of such mental change.''   The law was correctly declared in· this instruction.    ( 1 Whar. Crim. Law, § 187.)

Although the record in this case is very long, and the defense in the trial court was conducted with skill and vigor, we find it free from substantial error.    The instructions given by the court are remarkably full, clear, and fair to the defendant.    The jury have rendered a verdict which is sustained by competent and convincing testimony.    We affirm the judgment.

All the Justices concurring.