No. 80,181

STATE OF KANSAS, *Appellee*, v. VICKIE LUMLEY, *Appellant*.

(976 P.2d 486)

940

Opinion filed March 5, 1999.

*Debra J. Wilson*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Wayne R. Tate*, special prosecutor, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by defendant Vickie Lumley from her conviction of intentional second-degree murder of Robert Guerrero in violation of K.S.A. 1996 Supp. 21-3402(a).

Lumley raises a number of issues on appeal that fall into three categories: (1) The trial court erred in not sustaining an objection and admonishing the jury to disregard a witness' comment that Lumley had been bailed out of jail; (2) the trial court erred in limiting the evidence of her tumultuous relationship with Guerrero and his acts of violence towards her; and (3) the trial court improperly allowed the prosecutor to ask questions which assumed facts not in evidence and to make improper comments during closing argument.

Lumley was charged with intentional second-degree murder in connection with the December 12, 1996, death of Guerrero. A jury found Lumley guilty as charged. Intentional second-degree murder is an off-grid crime, with a sentence mandated by statute, and Lumley was sentenced to life imprisonment pursuant to K.S.A. 1996 Supp. 21-4706(c).

Lumley and Guerrero lived together in a common-law marriage. A few years before his death, Lumley and Guerrero began living in a mobile home in rural Stevens County, Kansas. The mobile

home did not have a telephone. Lumley characterized her relationship with Guerrero as "up and down" and said that when Guerrero was drinking heavily, the relationship was bad, otherwise it was good. Lumley testified that after Guerrero's father died in December 1993, he developed problems with his temper, and his violence towards her prompted her to move out of the mobile home several times. In May 1996, Lumley moved out of the mobile home, but she returned in June. She subsequently moved out again but returned in September 1996, upon reconciliation.

Lumley testified that in early November 1996, she and Guerrero had a violent argument and he was angry and throwing things. She further stated that he yelled at her two sons, who lived with them, and threw her against the bedroom wall and then against the living room wall. Guerrero took her to the emergency room in Hugoton with bruises on her chest and arms and pulled muscles in her upper body. Lumley testified that later in November 1996, another episode of violence occurred when Guerrero punched holes in the bedroom wall and "he kind of pitched me around."

Tyler Lumley, Lumley's 13-year-old son, testified that at times he was afraid of Guerrero and had seen him act violently. Justin Lumley, Lumley's 12-year-old son, testified that Guerrero had thrown a table, chairs, and a buffet out the door of the mobile home in early November. Neither son was present when the second November episode occurred.

On December 11, 1996, the day before his death, Guerrero and Lumley again argued. Lumley testified that Guerrero was angry because she had been subpoenaed to testify in a forgery case and he did not want her involved. She said that Guerrero did not come home that night but returned at approximately 8:30 a.m. on December 12, 1996. As she was leaving the house that morning, he told her that they would deal with their disagreement when he got home that night.

Justin returned home from school at about 4 p.m. on December 12, 1996, and Lumley took him to Hank and Karen Plummer's house to pick up Tyler. Lumley usually stayed with Karen Plummer when Tyler played basketball in town. Lumley brought some beer to the Plummers' house. When Hank came home from work

shortly before 5 p.m., another 6-pack of beer was purchased. Guerrero arrived at the Plummers' house at about 6:30 p.m. According to Hank, Guerrero wanted to speak with Lumley, but Lumley did not want to speak with him. Guerrero said, "okay" and went outside to his car to leave but came back in and told Lumley that he "was going home, if there was anything that she needed." Hank stated that Lumley responded, "Gas in the car, and you can go pick up my son at the game."

Guerrero then left to get the gas and to pick up Tyler. While Guerrero was gone, Karen broached the subject of a telephone bill and asked how Lumley and Guerrero planned to pay back $100 they owed the Plummers for the calls made using their phone. Guerrero returned to the Plummers' house with Tyler and the gas within 45 minutes. Hank testified that Guerrero came in the house and again asked Lumley if he could speak with her. When Lumley again said, "No," Guerrero announced that "he was going home and going to bed" and left at about 8:30 p.m. Lumley testified that he appeared very angry when he left and she did not want to get into a fight with him.

After Guerrero left, Hank told Lumley that he did not want her or Guerrero to use their telephone anymore. Lumley became angry because she thought Guerrero had paid the phone bill. According to Hank, Lumley suspected that Guerrero was calling another woman who lived in Liberal. However, there were also phone calls to Lumley, who had worked in Liberal while she was living with her brother during her separation from Guerrero in the summer of 1996. Lumley and Karen disagreed about who had made the telephone calls in question, and Hank became angry as well. Karen claimed that Lumley threw a glass down and shoved Karen as she was leaving. Lumley, however, testified that Karen physically tried to stop her from going home by blocking her and she merely pushed Karen aside to leave.

Karen testified that Lumley drank a lot of beer that afternoon and evening and that she thought Lumley was too drunk to drive home. Karen said that she tried to convince Lumley to remain at her house, but she would not. Lumley agreed, however, that her sons could stay at the Plummers' house. Lumley testified that she

left her boys with the Plummers and went home by herself because the boys did not want to go home since Guerrero was so mad.

Tyler testified that on the night of December 12, 1996, Guerrero picked him up from a basketball game and he could smell alcohol in the car, but "he acted pretty nice to me, but I don't know if he was mad." After Guerrero brought him to the Plummers' house, Tyler watched television with his brother and the Plummers' son, James. Guerrero came into the Plummers' house briefly but left again, and Lumley, Hank, and Karen sat at the kitchen table talking and drinking. When asked to describe how his mother was acting that night, Tyler said that he thought she was upset when she left, but he did not know why. Tyler stated that about 45 minutes after Guerrero left, his mother

"told us to get in the car, and we went out. And my brother got in the back seat, and I sat in the front seat. And my mom got in, and she—and I told her we didn't want to go back out to the house, we wanted to spend the night with James. And so she said, 'Fine.' And then we got out, and we went back in the house, and then she left."

When questioned why he wanted to spend the night with James, Tyler stated:

"[M]y brother told me that he'd already been thinking about it because, like, her and Robert [Guerrero] were both pretty upset, and I know that, like, either they were going to get into an argument or something out at the house or that, like, she was going to run into a ditch or something."

Justin testified to essentially the same version of events as Tyler.

Sheriff Russ DeWitt testified that he interviewed Lumley at about 2:30 a.m. on December 13. DeWitt testified that Lumley related the following regarding Guerrero's death:

"[S]he entered the west door of the trailer, said she looked left to see if he was in the kitchen, living room area, and he wasn't there. So she stepped to the right, to the south, into the bedroom, and he was sitting at a southeast corner of the bedroom in a chair, and said he was in his underwear and had a knife that he used occasionally to clean his fingernails, toenails. Said they began arguing, he stood up, and they met at the foot of the bed. They began struggling, they fell on the bed. When they hit the bed, she was on the bottom, he was on the top. As they rolled off the bed, she said as they began to roll off the bed, she noticed blood on his chest, and when they hit the floor, Robert was on the bottom, she was on the top. She said that she saw this knife in his chest, upper left chest area,

she pulled it out, closed the blade, tossed it on the bed, and put her hands over the wound to try to stop the blood. She said Robert told her about then he was hurt bad and, 'Go get help.'"

Detective Ted Heaton of the Stevens County Sheriff's Department testified that he had a conversation with Lumley at the scene of the mobile home and that Lumley gave him the same version of events that she gave to DeWitt at 2:30 a.m. Lumley told Heaton that during the argument Guerrero had a knife in his hand. When Heaton questioned Lumley again at the Sheriff's Department, she told the same version of events several times. Two officers then took Lumley to the hospital at about 12:30 a.m. on the morning of December 13, 1996. The cut on Lumley's arm required stitches, and she was returned to the Sheriff's Department about 1 a.m.

Lumley told the police that after Guerrero told her to get help, she left the mobile home and drove to the Perry residence. Although no one was living at the Perry residence, she knew there was a telephone in the house. She kicked in the back door to enter and called 911, as well as the Plummers, and told them that Guerrero had cut or stabbed himself. Deputy Purcell picked Lumley up as she ran down the road towards her house. Lumley had crashed her car into a tree in the Perrys' driveway and could no longer drive it. Purcell stated that Lumley was panicky, hurried, and hysterical.

When Purcell and Lumley reached the mobile home, Purcell found Guerrero lying on his back on the bedroom floor. He was near the bed wearing only a pair of underwear. He had a 2- to 3-inch cut on his upper left chest which was approximately ½-inch wide and there was blood by the wound "and some smeared down his lower body and a little bit on his legs." Guerrero's arms were by his side, the wound was open, and he did not appear to be breathing. Purcell performed CPR on Guerrero until the EMTs arrived.

Hank called the Sheriff's Department after Lumley called him from the Perry residence. He then went to the mobile home. Guerrero was on the floor and Lumley was hysterical and crying.

When Heaton arrived at the scene at 10:08 p.m. that evening, Lumley and Hank were outside. Heaton went inside and saw Guer-

rero on the floor in his underwear. An EMT told him that there were no signs of life, so Heaton told him to leave and declared the area a "crime scene." Heaton stated that he did not see or find any bloody rags, towels, or anything that might have been used to stop the bleeding. He found a knife, however, on the bed under the EMT bag. Heaton then went outside and spoke with Lumley. He noticed that she had a cut on her arm which he wrapped in gauze.

Lumley gave the police permission to search her mobile home. Dewitt and Heaton made a videotape of Lumley's residence about 4 a.m. the morning after Guerrero was killed. They observed a 12-gauge shotgun pump standing up in the southwest corner of the bedroom. Heaton testified that there was a shotgun shell on the north side of the bed and a shotgun shell on one of the nightstands or dressers along the east wall. They also found a knife sheath under the bed.

After viewing the scene, Dewitt spoke again with Lumley and told her that since Guerrero had blood on his legs, he must have been standing when he was cut. Lumley told Dewitt that she had taken the knife away from him and thrown it and Guerrero must have been cut at that point. Dewitt then told Lumley that Guerrero's wound was caused by a downward stroke which was not consistent with throwing a knife. Lumley responded that she had taken the knife away; that she was tired of getting thrown around; and that she struck him with the knife to get him away from her.

Heaton testified that when he and Dewitt questioned Lumley again at about 6 a.m., her story changed slightly. The officers "indicated to her by question that it couldn't have happened that way. And from the first scenario that I gave you earlier to this particular time, she said, 'Well we got into a struggle, and I got a hold of the knife, and I threw it to get it away from me. And that must have been when I cut him.' And that was the change in the story." During this 6 a.m. interview, Lumley demonstrated for the officers what had happened, and she indicated that the knife was clearly in Guerrero's right hand. Heaton stated that when they questioned Lumley in the afternoon or early evening on December 13, her story changed again. Heaton related Lumley's version of events at that time as follows:

"He had the knife, and then she got the knife. However she got it, that's unclear. And then it changes there, that she stabbed him to get him away from her, not the part about trying to throw it away or fell to the bed and caused the wound."

When Lumley testified at trial, she stated that she had never told Heaton or DeWitt that she cut Guerrero with the knife while trying to take it away from him. She denied stabbing Guerrero. Dewitt was well acquainted with Guerrero and testified that he was a very strong man with good upper body strength.

Dr. Hubert Peterson, a pathologist in Liberal, Kansas, conducted the autopsy on Guerrero and determined that he had suffered a single stab wound to the upper left chest which had caused him to bleed to death. This wound went 5½ to 6 inches into his body and reached his heart. The knife went parallel to the rib cage, and it would usually take a fair amount of force to make this wound. However, such penetration could occur fairly easily with a sharp knife. Blood splatters on Guerrero's body indicated that he was upright when he was stabbed, because the way the blood had travelled from the wound was not consistent with a body in the supine position. Most of Guerrero's bleeding was internal into his chest cavity.

Dr. Peterson further testified that Guerrero's wound could be consistent with him turning away from or turning towards the person with the knife, and it was not likely that he was directly facing a person with a knife when the wound was inflicted. Dr. Peterson also testified that it was possible that Guerrero's wound could have occurred as the result of a fall during a struggle, but it would have been difficult for him to have caused the wound himself while holding the knife in his right hand. Likewise, it would have been awkward for him to have caused the wound to himself with his left hand. When the prosecutor asked Dr. Peterson if "two people were fighting and fell on a bed flat, it would be next to impossible to— for the bed or the force of the bodies to insert the knife into Robert's chest [in] that direction?" Dr. Peterson responded that it would be difficult, but it could be possible.

Upon cross-examination, Dr. Peterson noted that Guerrero's wound "was unusual in that it was rather deep to be so oblique." He responded that Guerrero's wound could be consistent with the

scenario that Lumley had a hold on Guerrero's hand and wrist, they were struggling, and in the struggle he fell on the bed. Defense counsel asked him "[I]f the body were placed in an upright position shortly after the injury, within a matter of seconds, would those types of bloodstains on the abdomen be consistent with that?" Dr. Peterson responded that "[i]t's conceivable it could be, yes."

Kelly Robbins, a blood analysis expert who worked in the Kansas Bureau of Investigation crime laboratory, testified regarding the blood stain analysis done on items from the scene. She stated that blood of both Guerrero and Lumley was found on the top cover of the bed. A blood sample taken from a sock was consistent with Guerrero's blood. She summarized that the knife used in the stabbing, a sheet beneath the bedspread, the sock, and the carpet showed only Guerrero's blood. The pants and shirt that Lumley was wearing the night of Guerrero's death were analyzed and showed only Lumley's blood and none of Guerrero's blood.

The State presented witnesses who testified that Lumley had made jealous threats against Guerrero. Lori Cole had been friends with both Guerrero and Lumley for about 2 years and worked part-time at the bar in Liberal where Lumley previously worked. Cole testified that her last conversation with Lumley was in Liberal about 2 weeks prior to Guerrero's death. Cole stated:

"We sat and had—I had a drink and she had a beer. She said things that did not—I did not believe at the time that she would actually do because she just always talked. She said that she would kill him, that she carried a knife in her purse, which I knew she always did anyway, from knowing her previously."

When the State questioned Cole regarding whether Lumley had indicated why she would make such a threat, Cole stated that Lumley had not said why and that Lumley did not mention anything to her about Guerrero dating other women.

Anna Aranda also testified for the prosecution. She had known Guerrero for about 13 years and Lumley for about 7 to 8 years. Anna described Guerrero and Lumley's relationship over the last 2 years as "[v]ery unstable, a lot of fighting, a lot of fighting on [Lumley's] part that I've witnessed."

Dana Jones, Lumley's brother, testified that in August 1996, his sister was "quite upset because some rumors had been flying around that Robert had slept with a girl named Mandy." He testified that Lumley was upset, but she never threatened to kill Guerrero.

In its rebuttal evidence, the State called Trinidad Aranda, Jr., Anna's husband. Junior stated that on August 14, 1996, Lumley ran into their backyard and said she was going to kill Robert and then kill Mandy. Junior was also present when Lumley came to the Aranda house in September 1996. When asked whether Lumley had made any threats against Guerrero, he stated that she had said "she was going to kill Robert, and Mandy was next."

Anna's daughter, Jessica, also testified regarding the August 14 incident and stated that Lumley said she had seen Guerrero at Mandy's residence and that "if she couldn't have him, no one else can." Jessica was also present when Lumley came to the Aranda house in September and said Lumley was irate that Guerrero was at Mandy's house. She testified that Lumley again threatened to kill Guerrero and Mandy.

Lumley denied making any of the threats referred to by the State's witnesses in their testimony. Lumley testified that (1) she did not believe that Guerrero was seeing other women in the fall of 1996, (2) she did not stab him, (3) she loved him, (4) he was a good person when he was not drinking, and (5) they had been together and helped each other for 8 years.

Lumley took the stand and testified on her own behalf. She related the following version of events that led up to Guerrero's death:

"I opened the back door, and I looked—I went in the house, I looked towards the living room, and I walked into the bedroom. Robert was sitting in his chair. . . . . And he was already starting to get up out of the chair as I went to the bedroom. And he was very angry, and he was yelling at me. And he grabbed a hold of my arm, and he had the knife in his left hand, which would have been on my right side, and he was waving the knife around in front of me.

"And I had a scratch on the bottom of my chin. And I got really scared. And so I grabbed his hand that was around the knife. And he had kind of, you know, raised it up in the air because I was trying to get a hold of it. And I pushed it, I was trying to push it away from him, when I pushed it towards him. And he was

jerking me around, and we fell on the bed. And then I—I heard him go 'Uh,' and his hand kind of loosened. So I was—I was trying to get out from underneath him, and I rolled him to the floor, and I come out on top of him. And I seen the knife stuck in his chest. So I pulled the knife out of his chest, and I—we fell into a really tight place between the bed and the dresser. So I stepped over him, and I got him around here [demonstrating], close to his armpits, around here, and I dragged him flat. And I put my hands over the wound to stop the bleeding. And he told me to go get help. So when I was going out the bedroom, I almost fell.

"And I went straight to my car, and I went to Perry's house. And I was driving very, very fast because I was very, very scared, and I was upset. And that driveway—it's really dark out there, and I went to the north side of the driveway, and it kind of curves, and so my car started doing this [demonstrating], and it went against the tree."

## I. EVIDENCE

The admissibility of evidence lies within the sound discretion of the trial court. In *State v. Sims*, 265 Kan. 166, 175, 960 P.2d 1271 (1998), the court stated that " 'it is clear that our standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion' " (quoting *State v. Sims*, 262 Kan. 165, 170, 936 P.2d 779 [1997]). In *State v. Gardner*, 264 Kan. 95, 103, 955 P.2d 1199 (1998), we noted that "[a] trial court's ruling regarding the admission of evidence is subject to an abuse of discretion standard of review." (Citing *State v. Vaughn*, 254 Kan. 191, 204, 865 P.2d 207 [1993].) Further:

" 'Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. . . . If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. Judicial discretion must thus be considered as exercisable only within the bounds of reason and justice in the broader sense and be considered abused only when it plainly overpasses those bounds.' *State v. Stallings*, 262 Kan. 721, Syl. ¶ 6, 942 P.2d 11 (1997)." *State v. Gardner*, 264 Kan. at 104.

The *Stallings* court also noted that the "[o]ne who asserts that the court has abused its discretion bears the burden of showing such abuse of discretion." 262 Kan. 722, Syl. ¶ 7.

Under K.S.A. 60-401(b), relevant evidence is evidence "having any tendency [in reason] to prove any material fact. For evidence of collateral facts to be competent, there must be some material or logical connection between them and the inference or result

they are designed to establish." *State v. Walker*, 239 Kan. 635, 644, 722 P.2d 556 (1986) (citing *State v. Reed*, 226 Kan. 519, 524, 601 P.2d 1125 [1979]).

Lumley argues that the trial court had the duty to exclude prejudicial evidence with little or no probative value. In *State v. Benoit*, 21 Kan. App. 2d 184, Syl. ¶ 11, 898 P.2d 653 (1995), the court noted that when a question arises "as to whether evidence at trial is unfairly prejudicial, the trial court has an obligation to weigh the probative value of the evidence. When the prejudicial effect of the evidence on the trier of fact outweighs the probative value of the evidence, the evidence should be excluded." Lumley asserts that Karen Plummer's testimony about Guerrero borrowing bond money to get her out of jail was irrelevant, yet highly prejudicial, and the trial court should not have permitted it. The following dialogue between the prosecutor and Karen about the money owed on the phone bill contains the complained-of statement:

"Q. [Mr. Tate] And approximately how much was owed on that bill to you?
"A. [Karen] Well, through, like, all summer and stuff, they owed me about a hundred, or more, plus the $200 for bond that we loaned him to get Vickie out of jail.
Mr. Kuharic: Objection, Your Honor, objection, Your Honor.
"A. So about 300."

Lumley correctly notes that the court never ruled on the objection. In *State v. Lee*, 263 Kan. 97, Syl. ¶ 3, 948 P.2d 641 (1997), the court stated that "[a] trial court's decision concerning the admissibility of evidence will not be disturbed on appeal absent a showing of abuse of discretion." In *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994), *aff'd* 260 Kan. 85, 917 P.2d 859 (1996), the court explained that the reviewing court must scrutinize each case "on its particular facts to determine whether a trial error is harmless error or prejudicial error when viewed in the light of the trial record as a whole, not whether each isolated incident viewed by itself constitutes reversible error." (Citing *United States v. Grunberger*, 431 F.2d 1062 [2d Cir. 1970].)

Lumley contends that the complained-of evidence was not relevant; thus, it was not admissible. K.S.A. 60-401(b) provides that relevant evidence means "evidence having any tendency in reason

to prove any material fact." K.S.A. 60-407(f) states that "all relevant evidence is admissible." Lumley argues that the evidence indicating that she had been in jail before served no purpose other than to degrade her and had no bearing on any contested issues at trial.

In *State v. Bradford*, 219 Kan. 336, Syl. ¶ 1, 548 P.2d 812 (1976), the court held that "[w]hether inadmissable testimony constitutes harmless or reversible error depends upon the circumstances of the case in which the question arises." Bradford appealed from a conviction of murder in the second degree. One of his issues on appeal asserted that "testimony by a state's witness that defendant had been in prison inflamed and prejudiced the jury." 219 Kan. at 337. In *Bradford*, as in the case at hand, a witness for the State mentioned during her testimony that Bradford had been in the reformatory and in prison. Lumley's case and *Bradford* are similar in that it is apparent from the record in both cases that the statements "by the witness were unsolicited and were not intentionally placed before the jury by the State." 219 Kan. at 337-38. The *Bradford* court, however, took immediate action to strike the inadmissable evidence and admonished the jury to disregard it, whereas in this case the court did not rule on Lumley's objection.

The State contends that Karen's answer to the prosecutor's question was partially nonresponsive and cites to *State v. Gray*, 55 Kan. 135, 140, 39 Pac. 1050 (1895), wherein the court stated:

"Where a proper question is asked, and an improper answer given, the only remedy of the aggrieved party is by motion to strike [it] out. It is impossible for the court to answer in advance to exclude an improper answer to a proper question. The propriety of the answer cannot, in the nature of things, be determined before it is given."

The State also cites *State v. Childs*, 198 Kan. 4, 422 P.2d 898 (1967). In *Childs*, the State asserted that a police officer's answer was nonresponsive and clearly unforeseeable. Defense counsel objected, but the trial court did not rule on the objection. The *Childs* court held that the unsolicited answer was clearly unforeseeable because it was an unresponsive answer to a proper question. Therefore, it was incumbent on the defendant in *Childs* to move to strike the objectionable portion of the answer. Thus, if a witness answers a question so quickly that an objection cannot be made prior to

the answer, a motion to strike is the proper remedy. Having failed to move to strike the evidence, Lumley has not preserved the issue for appeal.

## II. RELATIONSHIP WITH GUERRERO

The admissibility and exclusion of evidence lies within the sound discretion of the trial court. *State v. Peckham*, 255 Kan. 310, 319, 875 P.2d 257 (1994). Lumley argues she was denied her right to present a defense by the judge's rulings placing limitations on her introduction of evidence regarding her relationship with Guerrero and his acts of violence towards her. Lumley asserts that in cases of marital homicide, evidence which explains the relationship of the parties is always admissible, and because self-defense was asserted, she had the right to present evidence of Guerrero's violent nature.

Lumley argues that the trial court's ruling to limit the evidence to testimony from herself and her sons violated her right to present a defense because she would have called other witnesses to testify about her violent relationship with Guerrero. Lumley asserts that she would have presented evidence essential to her defense from Hank and Karen Plummer, Guerrero's mother, and a counselor from a rape crisis center.

Lumley avers that the State portrayed her as an angry, jealous aggressor. She defended, however, on the grounds that she returned home to a violent, angry husband, who attacked her. Lumley maintains that the "marital homicide exception" and the Fourteenth Amendment right to present a complete defense supersede the provisions of K.S.A. 60-446, which provides:

"When a person's character or a trait of his or her character is in issue, it may be proved by testimony in the form of opinion, evidence of reputation, or evidence of specific instances of the person's conduct, subject, however, to the limitations of K.S.A. 60-447 and 60-448."

In *State v. Taylor*, 234 Kan. 401, 673 P.2d 1140 (1983), Taylor was convicted of first-degree murder for killing his wife. He asserted on appeal that the trial court erred in allowing the introduction into evidence of a notebook containing letters to Taylor written by the deceased wife when they had attended a marriage

encounter session together. One of the letters stated that Taylor's temper, anger, and outbursts greatly scared her. The notebook also contradicted Taylor's claim that his wife had determined not to seek a divorce and they were resolving their marital problems. The wife wrote in her notebook that she was attending the marriage session to help prepare Taylor for divorce and that a marital relationship was no longer possible for them. Taylor objected to the admission of the wife's notebook on the grounds of relevancy, materiality, remoteness, and hearsay. The *Taylor* court held:

"Evidence of prior acts between a defendant and a victim are admissible independent of K.S.A. 60-455 if the evidence is to establish the relationship between the parties, the existence of a continuing course of conduct between the parties, or to corroborate the testimony of the complaining witness as to the act charged. Cases have allowed prior conduct to be admitted into evidence where a family relationship existed." 234 Kan. at 407.

The State filed a motion in limine to limit evidence regarding Guerrero's turbulent character. In its motion, the State asserted that since self-defense was an issue in the case, evidence of his turbulent character was admissible, but such evidence should be confined to evidence of his general reputation in the community. Also, specific instances of misconduct could only be shown by evidence of conviction of a crime. In support of its motion, the State cited *State v. Alderson*, 260 Kan. 445, 922 P.2d 435 (1996), and *State v. Deavers*, 252 Kan. 149, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993). The *Alderson* court stated that "where self-defense is an issue in a homicide case, evidence of the turbulent character of the deceased is admissible. Such evidence may consist of the general reputation of the deceased in the community, but specific instances of misconduct may be shown only by evidence of a conviction of a crime." 260 Kan. 446, Syl. ¶ 11.

The trial court initially stated that it was "[g]oing to prohibit any attempt to introduce evidence of turbulent character of the deceased, except by general reputation in the community, and except by specific evidence of conviction." The judge explained to defense counsel, however, that he did not want the defense to misinterpret this ruling and stated:

"I'm not limiting your client's testimony or other evidence of—from your client, as you proffered earlier in the hearing when you indicated that you would have evidence to offer from the defense. But at this point in time, I'm going to prohibit any attempt to show [Guerrero's] character—any turbulent nature of the deceased's character, except by general reputation and except by conviction, understood?"

Defense counsel questioned whether the judge was ruling that Lumley could not testify to prior acts by Guerrero. The judge clarified his ruling and specified that he was not ruling that Lumley could not testify to Guerrero's prior acts. He stated that he was not making such a ruling and did not "in any way, shape, or form even begin to approach that. The [State's] motion in limine goes to character evidence, and it only goes that far, and that's as far as I'm going to rule on it; understood?"

Defense counsel requested the admission of evidence to prove Lumley's state of mind and her use of self-defense. The judge ruled:

"[O]nce the defendant, and only if the defendant, has introduced evidence of self-defense, then, at that point in time, the defendant is entitled to introduce into evidence character, turbulent character, of the defendant, if you have a witness available for that, and evidence of violent nature or cruel nature between the defendant and the decedent."

The judge cited *State v. Hundley*, 236 Kan. 461, 464, 693 P.2d 475 (1985), in which the court stated that "[i]t is well settled in Kansas that when self-defense is asserted, evidence of the cruel and violent nature of the deceased toward the defendant is admissible." The judge also cited *State v. Gray*, 179 Kan. 133, 135, 292 P. 2d 698 (1956). The *Gray* court held that a defendant on trial for murder, "after laying a proper foundation by evidence tending to show that in committing the offense he [or she] acted in self-defense, may introduce evidence of the turbulent and quarrelsome character of the deceased." 179 Kan. 133, Syl. ¶ 1.

When Lumley testified, she presented theories involving both accident and self-defense. Thus, the court permitted her to testify in detail about Guerrero's general propensity for violence, as well as specific episodes of his violence against her. She testified that she was "very scared" of Guerrero because of an incident in early

November 1995. The State objected when Lumley began to explain the incident, and the court held an off-the-record discussion between counsel and overruled the State's objection.

Lumley subsequently testified regarding a violent episode with Guerrero occurring in early November 1995. Lumley testified that Guerrero was drunk, mad, and

"started tearing up the house and throwing the furniture out the door and going after the kids and yelling and screaming. And he physically took me from the living room into our bedroom, and he threw me against the wall. There was a big ol' place where you could see that I had been against the wall. And I almost went through the windows. They all broke, they had to be replaced. He tried to smother me. He was very violent, and very upset, he was very mad, and he was throwing me around.

"And he went back out of the house, and came back in. And I had gone back in the—into the living room. And the boys had said something to him, and he started down the hall. And I got between him and the boys, and I ended up across the living room. He kind of pitched me across the living room. And I had—I started feeling really bad, having pains in my chest and up my arm.

"And he continued to tear out dresser drawers and throw them out the door and throw the silverware out the drawer and door, and the buffet and the table. He was very drunk and very mad.

"And he ended up taking me to the Hugoton hospital, to the emergency room. And I was seen by a doctor there. And I had—I had bruises on my chest, and the upper muscles in my body were pulled, and had bruises on my arms."

Lumley also testified that a similar episode had occurred later in November 1996, wherein Guerrero had been drinking, became angry with her, and "he kind of pitched me around. He put holes in the walls. And he was screaming, and he was hollering." Lumley testified that she moved out of the mobile home in May 1996 and lived with her brother in Liberal because of Guerrero's "drinking and because of his temper and because we couldn't get along." Lumley and her sons resumed living with Guerrero in June 1996 but moved out again a few weeks later. Lumley said they reunited in September 1996 because they had resolved their relationship during the summer and Guerrero "said he loved me, and I really loved him. So I came back home to work this out. He said he would stop drinking."

Lumley's sons also testified regarding specific acts of violence by Guerrero. Tyler testified that during the first November incident, Guerrero and Lumley were arguing and Guerrero was

"pretty mad. And they were arguing and stuff in their bedroom. And when he came out, they were yelling, and he—there was a couple of 12-packs of pop on the table, and he knocked them off the table and then tipped over the table. And then he started throwing stuff out the door.

"And then my mom was walking back to our room or something, and she tripped over the coffee table in the middle of the floor. And she started holding her chest like she was having a hard time breathing and stuff. And Robert [Guerrero] took the table and threw it out the door."

Tyler testified that he had not seen Guerrero hit Lumley during this episode, but he could hear yelling and screaming coming from the bedroom. He also heard "stuff being thrown and stuff hitting the wall, and I heard a window break." When asked whether he was afraid of Guerrero, he answered, "Sometimes." Justin testified to a similar version of events regarding the November incident.

Lumley correctly quotes that "[t]he rule in Kansas is that in a case of marital homicide, evidence of a discordant marital relationship and a wife's fear of her husband's temper is competent as bearing on the defendant's motive and intent." *Taylor*, 234 Kan. at 408.

Lumley's brief states that she was allowed to present her testimony and the testimony of her two sons regarding Guerrero's acts of violence in the home, but appellate counsel was "informed" by trial counsel that she had planned to present additional testimony from Hank and Karen Plummer regarding Guerrero's violent nature and certain acts of violence against Lumley by Guerrero. Further, trial counsel would have called Guerrero's mother to testify that she had, at times, seen bruises on Lumley.

In the absence of a proper proffer, this court has no way to know what the proposed witnesses would have said, and it is impossible to determine whether their testimony would have been admissible. The argument that these witnesses would have been called to testify is raised for the first time on appeal. "A point not raised in the trial court cannot be raised for the first time on appeal." *State v. McDaniel*, 255 Kan. 756, 765, 877 P.2d 961 (1994) (citing *State v. Ji*, 251 Kan. 3, 17, 832 P.2d 1176 [1992]). Further, the trial court was under no obligation to allow the testimony of witnesses whose testimony was never proffered.

At trial, Lumley never called Hank or Karen Plummer, Guerrero's mother, or the counselor from the rape crisis center as witnesses to elicit their testimony, and Lumley did not proffer their testimony. In *State v. Coleman*, 253 Kan. 335, 344, 856 P.2d 121 (1993), the court stated that "[i]t is well established that a party may not assert error based upon the erroneous exclusion of evidence in the absence of a proffer of that proposed evidence. [Citations omitted.]" K.S.A. 60-405 governs the erroneous exclusion of evidence and provides:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers."

If Lumley had additional evidence of Guerrero's violent nature, she should have called these witnesses. If the court would not allow her to call them, she had an obligation to proffer their testimony. However, no such evidence was excluded and no such evidence was proffered. Thus, Lumley cannot assert error based upon the erroneous exclusion of evidence in the absence of a proffer of their proposed testimony.

After Lumley asserted her self-defense theory, the trial court followed its ruling and Lumley and her sons were allowed to present significant testimony regarding Guerrero's alleged violent conduct and abusive acts. For this court to reverse the trial court on the basis of a decision regarding admission or exclusion of evidence, we must find that the trial court abused its discretion. *State v. Stallings*, 262 Kan. 721, 726, 942 P.2d 11 (1997). A reasonable person could take the view adopted by the trial court under the circumstances of this case. Thus, the trial court did not abuse its discretion, and this issue fails.

### III. PROSECUTOR'S COMMENTS

In *State v. Collier*, 259 Kan. 346, 354, 913 P.2d 597 (1996), the court stated:

"The analysis of the effect of a prosecutor's allegedly improper remarks is a two-step process. First the appellate court determines whether the remarks were outside of the considerable latitude the prosecutor is allowed in discussing the evidence. This analysis commences with the holding that '[i]n criminal trials, the prosecution is given wide latitude in language and in manner of presentation of closing argument as long as it is consistent with the evidence adduced.' *State v. Duke*, 256 Kan. 703, Syl. ¶ 5, 887 P.2d 110 (1994)."

Second, "[e]ach case must be scrutinized on its particular facts to determine whether a trial error is harmless error or prejudicial error when viewed in the light of the trial record as a whole, not whether each isolated incident viewed by itself constitutes reversible error." *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994). Appellate review of this issue is governed by the following standard:

" 'Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial.' *Whitaker*, 255 Kan. 118, Syl. ¶ 7. 'In deciding whether improper remarks by the prosecution during closing argument constitute harmless error, the reviewing court must be able to find that the error had little, if any, likelihood of changing the result of the trial. Such a belief must be declared beyond a reasonable doubt.' *State v. Gibbons*, 256 Kan. 951, Syl. ¶ 9, 889 P.2d 772 (1995)." *Collier*, 259 Kan. at 354.

This court must analyze the prosecutor's questions on cross-examination under a similar standard. Specifically, "[i]n deciding the question of whether prosecutorial misconduct requires reversal, an appellate court determines whether there was little or no likelihood the error changed the result of the trial." *State v. Moncla*, 262 Kan. 58, Syl. ¶ 3, 936 P.2d 727 (1997).

Lumley maintains that the State sought through the testimony of Karen and Hank Plummer, that on the day of Guerrero's death, Lumley discovered that Guerrero had been making telephone calls to a woman named Mandy Watson. If the State could have established that evidence, the defense contends, it would have refuted her self-defense or accident claim and tend to support a theory of intentional murder. Neither Hank nor Karen testified that Lumley saw Watson's telephone number on the phone bill; thus, Lumley contends, the State failed to establish its claim.

Lumley asserts that despite the lack of such testimony, the prosecutor was allowed to question Lumley in a manner which implied that the Plummers had testified that she had discovered such information on the day of Guerrero's death. Further, the prosecutor was allowed to make the same implication and misstate the evidence in closing argument. Lumley thus contends that such misstatements denied her a fair trial. The following portion of the prosecutor's cross-examination is cited by Lumley as misstating the evidence:

"Q. [Mr. Tate] Isn't it true that he [Guerrero] was seeing Mandy Watson?
"A. [Lumley] No. He came to my house and informed me that he got mad at me, and he—it was my fault he slept with her one time. And we talked that out, and it was done.
"Q. [Mr. Tate] And isn't [it] true that you expressed a great deal of anger at the Plummer residence on December the 12th that Robert [Guerrero] had been using their phone to call her?
"A. [Lumley] No, Robert had been using that phone to call me at my brother's house, to my knowledge.
"Q. [Mr. Tate] You heard the testimony of [the] Plummers, didn't you?
"A. [Lumley] Yes.
"Q. [Mr. Tate] And they indicated they'd gone over the phone bill with you, and that some of those numbers were to Mandy Watson?
"A. [Lumley] I've never seen the phone bill, Mr. Tate.
     Mr. Kuharic: Objection, there's no testimony to that effect.
     Court: Fair cross-examination, Mr. Kuharic. Proceed.
"Q. [Mr. Tate] Isn't it true that they showed you those phone bills, and there were phone calls to Mandy Watson?
"A. [Lumley] I wouldn't know if they were to Mandy Watson, I don't know her phone number."

Lumley asserts that these questions during cross-examination violated her right to a fair trial because neither Karen nor Hank Plummer testified that Lumley had seen Watson's telephone number on the phone bill.

Although neither Karen nor Hank specifically mentioned Watson's name, Karen testified that when she and Lumley had the conversation about how the Plummers' phone bill would be repaid, Lumley indicated that she thought Guerrero had been using the phone to call other women. Specifically, the prosecutor asked

Karen: "Did [Lumley] indicate to you that she thought he [Guerrero] was calling other women?" Karen replied: "Yea, some girls."

Likewise, Hank never mentioned Watson's name specifically, but when the prosecutor asked Hank whether Lumley had made any comments about who she thought Guerrero had been calling on the Plummers' phone, he testified that Lumley's response was "[t]he bitch is in Liberal." Hank said that upon showing her the phone bill, Lumley recognized numbers on it and stated that "she knew what he was doing when he was calling, and she knew who the numbers were for, who the numbers were to." Hank could not remember to whom Lumley said the phone numbers belonged, but stated that it was a "girl's name, and the other calls were bars, to bars in Liberal." Hank also stated that Guerrero had also made calls to a Liberal bar looking for Lumley when she was working at a bar in Liberal.

Assuming that the prosecutor's remarks were improper as outside of the facts adduced in the case up to the point when the Plummers testified, the prosecutor's questions do not constitute reversible error. When these questions are viewed in the light of the trial record as a whole rather than as isolated incidents, the complained-of conduct does not mandate a reversal of Lumley's conviction.

In terms of the overall record, there was an abundance of testimony regarding Watson and Lumley's reaction to Guerrero's affair with her. Lumley admitted that such an affair had occurred when the prosecutor asked her whether Guerrero had been seeing Watson, and she answered that Guerrero was angry at her and "it was my fault he slept with her one time." Further, the State presented various witnesses who testified that Lumley thought Guerrero was still having an affair with Watson.

In conclusion, although the prosecutor may have made improper remarks when questioning the Plummers because no evidence had been submitted regarding Watson, such remarks do not constitute reversible error when viewed in light of the trial record as a whole.

## IV. IMPROPER CLOSING ARGUMENT

In *Whitaker*, the court stated:

"Before an objectionable statement made by a prosecutor on matters outside the record will entitle the accused to a reversal of his or her conviction, it first must appear that it was injurious to the accused and was likely to affect the jurors to the accused's prejudice. [Citation omitted.] Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial." 255 Kan. at 134.

Lumley argues that the prosecutor overstepped the bounds of appropriate argument by asserting facts not in evidence, rather than arguing that the evidence was consistent with his theories. Lumley cites *State v. Steadman*, 253 Kan. 297, 855 P.2d 919 (1993), as authority that it is a fundamental rule that counsel confine their remarks to matters in evidence. The *Steadman* court stated that "[i]n a criminal trial, the defendant has the right to have the jury determine from the evidence whether the defendant is guilty or not." 253 Kan. at 304.

In *State v. Bradford*, 219 Kan. 336, 338, 548 P.2d 812 (1976), the court noted that "[t]he defendant is entitled to a fair trial but not a perfect one. Whether inadmissible testimony constitutes harmless or reversible error depends upon the particular evidence and the circumstances of the case in which the question arises." The *Bradford* court professed:

" 'A relevant factor in determining whether an erroneous admission of evidence is harmless error is the weight of evidence supporting the conviction. . . . We are convinced upon a review of the whole record that the evidence was of such direct and overwhelming nature and showed appellant's guilt of the two offenses charged to such extent that admission of the California conviction could not have affected the result of the trial and therefore its admission must be deemed harmless error.' " 219 Kan. at 338 (quoting *State v. Fennell*, 218 Kan. 170, 174, 542 P.2d 686 [1975]).

In *State v. Bly*, 215 Kan. 168, 178, 523 P.2d 397 (1974), *overruled on other grounds State v. Mims*, 220 Kan. 726, 730, 556 P.2d 387 (1976), the court said:

"[T]he erroneous admission of evidence during a trial does not in every case require a reversal of a conviction. [Citation omitted.] A defendant is entitled to a *fair* trial but not a perfect one, for there are no perfect trials. [Citations omitted.] Not every admission of inadmissible evidence can be considered to be reversible error; instances occur in almost every trial where inadmissible evidence creeps in,

usually inadvertently. K.S.A. 60-261 requires the courts of Kansas to disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. This rule known as the harmless error rule applies unless the error is of such a nature as to amount to a denial of substantial justice. [Citation omitted.]"

Lumley argues that the prosecutor's remarks in closing were mere theories of how the stabbing could have occurred and assertion of such theories was error when combined with the prosecutor's use of facts not in evidence. Lumley contends that because the prosecutor suggested that Lumley saw Watson's number on the phone bill the night that Guerrero was killed, this improperly portrayed her as having a motive to kill Guerrero. The defense argues that the Plummers never testified that Lumley saw Watson's number on the phone bill the night of the stabbing.

The same analysis applies to this argument as set out in the previous issue. Although the Plummers never testified that Lumley had seen Watson's number, they testified that she knew from the phone bill that Guerrero was calling other women. Hank noted that there was one particular woman whose name he could not remember. Thus, although Watson's name was not per se a fact in evidence, the suggestion that Lumley had seen Watson or another woman's phone number on the Plummers' bill does not warrant reversal when viewed in the light of the record as a whole.

Lumley also claims that the trial court erred in allowing the prosecutor to imply in closing argument that Lumley bore the burden of bringing forth evidence of her innocence. The first example cited by Lumley was the following remark made by the prosecutor:

"[I]t is very possible and very likely that the defendant comes into the room, the pants are on the bed, she takes the scabbard off, gets the knife out, Robert is either in bed, in the bathroom, in [his] chair asleep, he comes in, there is a confrontation, and she stabs him. And if that's not how it happened, she was unable to explain, and she was there."

The second example Lumley cites is the following: "If you'll notice, who testified for the defendant? The defendant, her two children, and her brother. Do we have any independent testimony from the defendant? No. Do we have any physical evidence whatsoever that corroborates her statement? No, none whatsoever."

Lumley contends that these comments by the prosecution amount to constitutional error because the prosecution was essentially arguing that she failed to prove her innocence and this impermissibly shifts the burden of proof to her in violation of her rights under the Fourteenth Amendment to the United States Constitution.

Lumley fails to note, however, that in the first example, the prosecutor's next sentence was the following: "Now, one very important point for you to remember is that I have the burden of proof, the State of Kansas has the burden of proof." Thus, the prosecutor made clear that Lumley did not have the burden to prove her innocence. The second example should be considered in light of the preceding paragraph wherein the prosecutor mentioned the witnesses who testified against Lumley and commented that the "people who testified against her, they all testified that they were not only Robert's friends, but they were her friends. They weren't related to Robert. They're not some ringer[s] that we brought in off the street."

The prosecutor's statement that only Lumley and her relatives testified for the defense should be taken in the context of comparing the State's witnesses with the witnesses for the defense. The prosecutor appeared to be making the point that the State's witnesses did not have a motive to hurt Lumley because they had been friends with her. The statement that Lumley did not produce any corroborating physical evidence for her story does not necessarily imply that she had the burden to come forward with evidence to prove her innocence. Upon reading the record in its entirety, a great deal of time was spent during the trial on testimony by the pathologist and the blood splatter analyst. Even if it was misconduct by the prosecutor to suggest that Lumley had no physical evidence to support her version of events, in light of the record as a whole, this was not reversible error.

More importantly, the defense never objected to the prosecutor's complained-of comments during the trial's closing argument. " 'Since Kansas does not follow the 'plain error' rule used in federal courts, reversible error cannot be predicated upon a complaint of misconduct of counsel during closing argument where no contemporaneous objection is lodged. [Citation omitted.]' " *State v. Sex-*

*ton*, 256 Kan. 344, 363, 886 P.2d 811 (1994) (quoting *State v. Baker*, 249 Kan. 431, 446, 819 P.2d 1173 [1991]). If the prosecutor's statements, however, rise to the level of violating a defendant's right to a fair trial and, thus, deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. We have previously set out the appellate standard of review for the issue at hand:

"Each case must be scrutinized on its particular facts to determine whether a trial error is harmless error or prejudicial error when viewed in the light of the trial record as a whole, not whether each isolated incident viewed by itself constitutes reversible error. *United States v. Grunberger*, 431 F.2d 1062 (2d Cir. 1970). The court has a duty to stop improper argument '[w]here counsel refers to pertinent facts not before the jury, or appeals to prejudices foreign to the case.' *State v. Ruff*, 252 Kan. 625, 635, 847 P.2d 1258 (1993). Before an objectionable statement made by a prosecutor on matters outside the record will entitle the accused to a reversal of his or her conviction, it first must appear that it was injurious to the accused and was likely to affect the jurors to the accused's prejudice. *State v. Ruff*, 252 Kan. at 632. Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. Reversible error cannot be predicated upon a complaint of misconduct of counsel during closing argument where no contemporaneous objection is lodged. *State v. Baker*, 249 Kan. 431, 446, 819 P.2d 1173 (1991)." *State v. Whitaker*, 255 Kan. at 134.

Here, Lumley did not make a contemporaneous objection, and the statements do not rise to the level of denying Lumley her Fourteenth Amendment right to due process.

The defense next challenges that the prosecutor's following remarks came "perilously close" to impermissibly vouching for his own witnesses personally or stating that Lumley and her witnesses were lying.

"If you choose to believe a defendant who has a great deal at stake, who has every reason to lie, and her two sons who have testified on her behalf, and her brother who has testified on her behalf, related third parties, then you will find her not guilty. . . . Mr. Kuharic's client, the defendant, has had the luxury of having seven months to craft a story, to try to fit these facts while she was at the sheriff's office."

The same analysis applies to these remarks as applied to Lumley's claim that certain remarks by the prosecutor during closing argument constituted reversible error. No contemporaneous ob-

jection was lodged to these remarks, and even if we consider these comments to be prosecutorial misconduct, there was little or no likelihood that they changed the result of the trial.

Affirmed.